IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NIELSEN AUDIO, INC.,

       Plaintiff,

v.                                                                Civil Action No:

BUBBA CLEM a/k/a BUBBA THE LOVE
SPONGE and BUBBA RADIO
NETWORK, INC.,

       Defendants.

_____/

### COMPLAINT
### (Injunctive Relief Sought)

    Plaintiff, Nielsen Audio, Inc. ("Nielsen Audio"), by and through its undersigned attorneys, hereby files its Complaint against Defendants, Bubba Clem and Bubba Radio Network, Inc., and in support thereof states as follows:

### NATURE OF THE ACTION

    1.    This is an action for fraud, violation of Florida's Deceptive and Unfair Trade Practices Act, tortious interference with contractual and business relations and conspiracy.

    2.    Nielsen Audio is one of the nation's leading firms in the field of audience measurement and has been so for more than 50 years. Nielsen Audio's claims in this action arise from the Defendants' purposeful efforts to manipulate the radio audience estimates and station rankings for the Tampa-St. Petersburg radio market by, among other things, paying members of the Nielsen Audio survey panel to distort the radio audience estimates in their favor.

### *THE PARTIES*

3.    Nielsen Audio is a Delaware corporation with its principal place of business located at 9705 Patuxent Woods Drive, Columbia, Maryland, 21046.    Nielsen Audio is authorized to and does transact business in the State of Florida.    Nielsen Audio was known as Arbitron Inc. prior to September 30, 2013.

4.    Bubba Clem a/k/a Bubba the Love Sponge (hereinafter "Bubba Clem") was born Todd Allen Clem and, upon information and belief, legally changed his name in 1999.    Upon information and belief, Bubba Clem is a citizen of the State of Florida residing in St. Petersburg. Bubba Clem is a radio personality who appears regularly on a nationally syndicated radio show including in Tampa, Florida on WBRN Bubba 98.7 and in other markets in this District.

5.    Defendant Bubba Radio Network, Inc. ("BRN") is a corporation organized and existing under the laws of the State of Florida with its principal place of business located at 5021 West Nassau Street, Tampa, Florida 33607.    Upon information and belief, the BRN owns and produces the "Bubba the Love Sponge" radio show and syndicates the show throughout the United States.    According to its 2015 Florida Profit Corporation Annual Report, Bubba Clem is the sole officer and director of BRN.    Upon information and belief, BRN is owned and controlled by Bubba Clem.    Bubba Clem and BRN are hereinafter collectively referred to as the "Defendants".

### *JURISDICTION AND VENUE*

6.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 in that this is an action between citizens of different states and the amount in controversy exceeds $75,000.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c) on the grounds that: (i) Defendants are subject to personal jurisdiction in this District; (ii) Defendants reside and/or maintain a place of business in this District; (iii) Defendants regularly do and solicit business in this District; and (iv) substantially all of the events giving rise to this action took place in this District.

### FACTS COMMON TO ALL CLAIMS

#### The Integrity of the Nielsen Audio Audience Estimates is of Tremendous Importance to the Radio Industry

8.    Nielsen Audio is an international media and marketing research firm serving the media industry, advertising agencies and advertisers.   Nielsen Audio's business includes measuring local market radio audiences across the United States.

9.    For more than 50 years, Nielsen Audio and its predecessor Arbitron has been a leader in its field and is well-known for its radio audience estimates.   Nielsen Audio collects radio audience listening data by various means including through its Portable People Meter or PPM® ("PPM"), an electronic device that detects codes embedded within broadcasts from which Nielsen Audio formulates its detailed estimates as to what a participating panelist is listening to throughout the day.   Using this information, Nielsen Audio produces audience estimates and station rankings which it publishes in periodic reports and creates databases comprising these estimates, reports and other works.

10.    Nielsen Audio's audience estimates, reports and databases are original works of authorship and proprietary works which are licensed to subscribers pursuant to the terms of written agreements.   Nielsen Audio's subscribers include broadcasters, advertisers, advertising agencies, consultants, third-party processors and sales representatives in the radio industry in radio markets throughout the United States, including the Tampa-St. Petersburg Florida radio

market.   These audience estimates are widely used by radio broadcasters for a variety of purposes including: to determine whether to acquire a syndicated program; how much to pay for syndicated programs; to set prices for advertising time on their broadcasts; to make programming decisions; to determine which radio personalities to put on and remove from the air; and to determine how much to pay on-air talent.   Nielsen Audio's audience estimates and station rankings are also used by advertisers and advertising agencies to plan advertising budgets and make decisions about where and when to advertise.

11.     In the top radio markets, including Tampa-St. Petersburg, Nielsen Audio obtains information using its proprietary electronic measurement device, the PPM.   The PPM is a small, portable device that is worn or carried by the survey participant.   It detects inaudible codes embedded in a broadcast or within an audio stream which identify the radio station and the program being listened to and creates a log of instances in which those codes are detected.   The information is then transmitted to Nielsen Audio which can identify the broadcasts to which the individual survey participant was exposed throughout the day.   The PPM devices have a built in motion sensor to detect when the device is being worn or carried by the survey participant and when it is stationary.   After a pre-determined period in which there is no motion, the device goes into an inactive mode to minimize the chance of detection of audio signals when the survey participant is not carrying the PPM or otherwise present to hear the broadcast signals.

12.     Nielsen Audio scientifically and randomly selects the PPM panelists in a particular radio market to be demographically representative of the population in that market. The panelists who agree to participate in the survey are provided with PPM devices, and are trained how to use the PPM and transmit the data to Nielsen Audio.   The panelists are compensated by Nielsen Audio for their time and effort.

13.    Nielsen Audio keeps the identity of the panelists confidential and takes measures to ensure that the panelists comply with its procedures.  Only when a panelist complies with these procedures is the panelist's listening data included in the audience estimates.  This is to best ensure that the data incorporated into the audience estimates is untainted and unbiased and reflects the panelists' actual listening habits.  These safeguards are of utmost importance to Nielsen Audio and to its subscribers who rely on the integrity of the process.

14.    Nielsen Audio also goes to great lengths to maintain the integrity of its audience estimates with respect to the actions of its subscribers.  All of Nielsen Audio's station license agreements contain language expressly forbidding subscribers, including their agents, staff, and other employees or contractors such as on-air talent, from attempting to discover the identity of its survey participants, contacting those individuals or committing any act that could influence or distort the results of the survey.  The penalties for a subscribing station found to have interfered with the impartiality of the survey include being de-listed (i.e. excluded from the audience estimates for a period of time).

15.    To further ensure that broadcasters avoid any acts that could possibly distort the ratings, Nielsen Audio publishes a "PPM Ratings Distortion & Ratings Bias Handbook" that provides detailed guidelines and procedures for broadcasters to follow to help maintain the credibility and impartiality of its audience estimates.

16.    Broadcasters and on-air radio personalities are aware that there is a temptation to influence the audience estimates and station rankings to gain a competitive advantage in the radio market.  It is standard industry practice for broadcasters to train their on-air talent as well as programming and sales employees in the importance of avoiding all contact with Nielsen Audio panelists or to otherwise act in any way that could bias the ratings results.

### *Beasley Broadcast Group Carries Bubba Clem's Program in Tampa*

17.     Non-party Beasley Broadcast Group, Inc. ("Beasley") owns and operates approximately 53 radio stations in 12 markets throughout the United States.  Beasley's stations in the Tampa, Florida market include WYUU-FM; WRBQ-FM; WQYK-FM; WLLD-FM; WBRN-FM; and WHFS-AM.

18.     Beasley broadcasts the "Bubba the Love Sponge" radio program on station WBRN-FM 98.7 pursuant to the terms of a contract with the BRN.  In fact, in February, 2015, Beasley changed the call letters of its Tampa station to WBRN-FM to incorporate the name Bubba Radio Network into its brand.

19.     Beasley subscribes to Nielsen Audio's PPM radio audience estimates pursuant to a Radio Station License Agreement to Receive and Use [Nielsen Audio] PPM Data and Estimates dated September 24, 2013 (the "License Agreement").

20.     Beasley's License Agreement with Nielsen Audio prohibits any attempt to influence the Nielsen Audio survey results whatsoever, expressly forbidding the subscriber, its employees and agents from attempting to learn the identity of any survey participant, from contacting any survey participant and from engaging in any other act that has the potential to influence or distort the results of the survey.

### *Bubba Clem Engaged in a Scheme to Distort the Ratings*

21.     Bubba Clem is a well-known and controversial radio personality in the Tampa-St. Petersburg radio market.  Bubba Clem's program is produced in his own facility in Tampa and is syndicated for broadcast on numerous stations throughout the United States and is also available via streaming audio.  In Florida, Bubba Clem's show is carried on WBRN-FM in Tampa;

WRXK-FM in Fort Myers, WZLB-FM in Fort Walton Beach-Destin; WTRS-FM in Ocala; WBGF-FM in West Palm Beach; and WSJZ-FM in Melbourne.

22.    Bubba Clem has been a radio broadcaster for approximately 30 years.  Upon information and belief, Bubba Clem is well aware of the importance of the Nielsen Audio ratings to the success of any radio program, specifically, that programs and stations with high ratings can command higher rates and generate more advertising revenue than competing stations with lower rated programs.

23.    Bubba Clem is also well aware that the integrity of the Nielsen Audio ratings is of utmost importance in the radio industry and that no broadcaster or other radio personality should do anything that could affect the ratings or cause bias in any way.

24.    Upon information and belief, on or about July 29, 2015, Bubba Clem learned from Jason Fuller ("Fuller"), a strong supporter of Bubba Clem's show, that the household of one of his listeners had been selected by Nielsen Audio to participate in its survey of panelists (hereinafter, the "Cooperating Panelist") in the Tampa-St. Petersburg market and that 4 PPM devices were being delivered to the members of the Cooperating Panelist's household. Since Fuller was a mutual acquaintance of Bubba Clem and the Cooperating Panelist, Fuller facilitated Bubba Clem's initial contact with the Cooperating Panelist to recruit the Cooperating Panelist to help Bubba Clem manipulate the Nielsen Audio audience estimates.

25.    In a series of in-person meetings, phone conversations and numerous text messages sent throughout July and August, 2015, Bubba Clem offered to pay the Cooperating Panelist to manipulate the PPM monitoring of his household's listening habits to inflate the Nielsen Audio ratings for Bubba Clem's program artificially and provided detailed instructions about what he wanted the Cooperating Panelist to do.

26.     Bubba Clem met with the Cooperating Panelist, telling him that he would be paid $300 per month once Bubba Clem saw an improvement in his ratings resulting from the Cooperating Panelist's help.  He later sent a text message promising the Cooperating Panelist bonus money, up to $400 per month more, if target results were achieved.  Bubba Clem in fact paid the Cooperating Panelist a portion of the monies he promised to pay.

27.     Demonstrating his awareness that his plot to distort the ratings was prohibited and that all concerned were at great risk, on July 31, 2015, Bubba Clem sent the Cooperating Panelist multiple texts from his cell phone stating in part:  "U have to PROMISE NOT TO SAY A WORD . . . This could ruin me. B . . . THANK U. again this will kill the bad guys."  In an apparent reference to the Cooperating Panelist's PPM devices, Bubba Clem texted:  "We are so lucky to have those."

28.     Bubba Clem also provided detailed instructions to the Cooperating Panelist about what other stations he should tune to from time to time so as to avoid creating suspicion but, at the same time, not increase the ratings of competing programs.  In a series of text messages sent on July 31 and August 1, 2015, Bubba Clem instructed the Cooperating Panelist to listen to the station on which Bubba Clem's program was aired, and told him "Here are the stations you CAN NOT LISTEN TO. EVER 102.5 . . ."  Upon information and belief, 102.5 FM broadcasts one of Bubba Clem's main rivals.

29.     Bubba Clem boasted to the Cooperating Panelist that he had detailed working knowledge of the PPM device which included knowledge of how to circumvent the PPM's motion sensing technology.  He described that by using certain tricks the Cooperating Panelist could make it appear that he was listening to Bubba Clem's show even when the Cooperating Panelist was not carrying the PPM device.

30.     Bubba Clem warned the Cooperating Panelist to exercise caution while manipulating the PPM device so as to avoid suspicion by Nielsen Audio. In text messages, he stated: "Again. please take it seriously. And don't get lazy so we have them a long time. Don't want to loose (sic) them. SO PLEASE pay attention. U know I'll take care of u . . ."

31.     On or about August 9, 2015, apparently upset about a drop in listenership, Bubba Clem urged the Cooperating Panelist to try harder stating, "Got raw numbers today. We went down. It's so important you get up Please buddy. Please. I'm paying u!!!" Bubba Clem then offered to purchase radios and other devices and have them shipped directly to the Cooperating Panelist to aid him in his manipulation of the PPM ratings. Bubba Clem did in fact purchase those items using his own online Amazon account and had them shipped to the Cooperating Panelist's home to further his scheme.

32.     At all times relevant to these events, Bubba Clem was aided and abetted by others including at least Fuller. On or about August 7, 2015, the Cooperating Panelist complained to Bubba Clem that he was feeling pressured by Fuller. Bubba Clem responded in a series of text messages saying: "I've told u buddy to relax. I agree. Too much drama. We have another way to beat them. Don't be mad at me. I've tried not to be pushy . . . We all want the common thing. And we just all get all keyed up."

33.     Upon information and belief, Bubba Clem's activities were successful in that multiple Nielsen Audio panelists have, in fact, falsified their actual listening in response to Bubba Clem's solicitations. In one text Bubba Clem sent to the Cooperating Panelist, apparently referring to Nielsen Audio and the PPM devices, he stated: "I need u more than ever. I had a guy who had just 1 of them. And they took it from him Friday. Cause he wasn't smart about it . . .

He got lazy. And he didn't switch it up. Now it's gone. So I need your 4 more than ever buddy."

34.      The substance of Bubba Clem's preceding message to the Cooperating Panelist is accurate: Nielsen's internal procedures uncovered data received from a PPM panelist in the Tampa-St. Petersburg market—other than Cooperating Panelist—that appeared suspect and was removed from the survey results, and that PPM panelist's device was taken away from him by Nielsen on the date referred to by Bubba Clem in the message.

35.      Nielsen believes that additional PPM panelists in other markets may have been part of Bubba Clem's ratings distortion scheme and has taken measures to flag and remove suspect listening data from its survey.

### _Bubba Clem's Scheme is Exposed and he Admits Wrongdoing_

36.      In or about mid-August, 2015, after weeks of discussions and texts between Bubba Clem, the Cooperating Panelist and Fuller, the Cooperating Panelist disclosed Bubba Clem's scheme to Nielsen Audio which promptly commenced an investigation.

37.      Nielsen Audio was able to detect the tainted data received from the Cooperating Panelist's PPM device and remove it from the data which otherwise would have been included in its audience estimates.

38.      The mere possibility that tainted listening data was submitted to Nielsen Audio by panelists and could have found its way into the audience estimates seriously harms Nielsen Audio's reputation as well as the value of the audience estimates and station rankings as it raises doubt about the integrity of the Nielsen Audio ratings and requires Nielsen Audio to reassure its subscribers that it discovered and removed all of the affected data.

39.     On or about September 21, 2015, Nielsen Audio confronted Beasley with all of the evidence referenced herein of Bubba Clem's attempts to distort the ratings.   Beasley responded (i) by suspending Bubba Clem's live show on WBRN-FM, although it continued to air Bubba Clem's broadcasts on its other stations, and (ii) by issuing a press release on October 5, 2015, condemning Bubba Clem's actions and promising to implement training sessions to address Nielsen Audio ratings distortion and bias policies to all of its employees and on-air talent such as Bubba Clem.  A copy of that press release is annexed as Exhibit A.  Beasley ultimately suspended Bubba Clem's live broadcast on WBRN-FM for a total of 8 days.  As of October 6, 2015, Bubba Clem was back on the air on all of the Beasley stations that air his program.

40.     On October 6, 2015, Bubba Clem held a press conference in which he admitted having had contact with a Nielsen Audio PPM panelist and trying to influence that panelist's listening activities.  In pertinent part, Bubba Clem stated as follows:

> I would like to personally address some recent allegations that have been levied against me  . . .  As you may have heard, I was contacted directly by a ratings panelist in the PPM measurement ratings deal, and I was accused of attempting to influence the listening actives of a particular panelist. **And it's with deep regret and embarrassment that I face you directly and say that they're true.** There's no excuses, the buck stops with me and I cannot tell you how humbled and how embarrassed I am.  Even though Nielsen has confirmed that not in any way shape or form did my actions affect the ratings, it still is not acceptable and I take full responsibilities for what happened and subsequently the consequences that probably are here forward . . . There's no excuses, there's nobody to blame, I am the person to blame and I'll accept whatever happens moving forward . . .

A video of Bubba Clem's statement to the press is located at https://www.youtube.com/watch?v=ikQ3PgyPTEQ.

41.     To avoid even the appearance of doubt as to the integrity of its ratings and to eliminate any conceivable bias in favor of WBRN-FM due to Bubba Clem's actions, Nielsen Audio de-listed Beasley's station WBRN-FM from its September 2015 reports.

42.     Notwithstanding these developments, including Bubba Clem's public admission to one egregious example of panel tampering, Nielsen Audio has been harmed as has the entire radio industry. Based upon Bubba Clem's actions, Nielsen Audio's subscribers have expressed concern about the integrity of the survey and the possibility of additional ratings distortion activity by Bubba Clem.  The integrity of Nielsen Audio's audience estimates, which is essential to the radio industry and to the viability of Nielsen Audio's business, has been called into question.

43.     Nielsen Audio's reputation and the reputation of its ratings reports as an unbiased tool in the industry has been damaged irreparably and continues to be damaged as long as the possibility exists for Bubba Clem and those working in conjunction with him to contact PPM panelists and manipulate the PPM data to his advantage.

## COUNT I
### Fraud
### (Bubba Clem and BRN)

44.     Nielsen Audio repeats the general factual allegations contained in paragraphs 1 through 43 above as if fully set forth at length herein.

45.     This is a cause of action seeking money damages against Bubba Clem and BRN for fraud.

46.     Bubba Clem, acting on his own behalf and on behalf of BRN, knowingly contacted multiple Nielsen Audio PPM survey panelists for the purpose of recruiting them to help him tamper with the PPM survey results and provide false and misleading information to Nielsen Audio.

47.     Bubba Clem paid and instructed multiple panelists how to use the PPM devices in ways that would falsely overstate the time spent listening to his own BRN program on WBRN-FM and provided panelists with equipment to manipulate the PPM devices.

48.     The false and misleading data recorded by these PPM devices was transmitted to Nielsen Audio by multiple panelists who were under the dominion and control of Bubba Clem and BRN and who were acting as their agents and instrumentalities.  This false and misleading data was based on readings from PPM devices that were manipulated according to instructions provided by Bubba Clem to his agents and co-conspirators, including but not limited to the Cooperating Panelist.

49.     Bubba Clem, BRN and the panelists recruited by Bubba Clem intended for this false information to be incorporated into Nielsen Audio's audience estimates to artificially overstate Bubba Clem's audience.  They also understood and intended that this false information would be relied upon by Nielsen Audio, Beasley and the radio advertisers and advertising agencies in the affected radio markets.

50.     Nielsen Audio relied on that falsified data in reaching its initial September 2015 audience estimates.  After discovering irregularities in the data, and after incurring substantial cost and expense, Nielsen Audio removed the fraudulent data from its internal calculation of listening estimates and generated new estimates that were unaffected by the Defendants' fraud.

51.     As a result of Bubba Clem's fraudulent actions and those of his agents and co-conspirators, Nielsen Audio was forced to expend time, effort and money to investigate the allegations of ratings tampering, detect and analyze the falsified listening data, remove that data from its internal calculation of listening estimates, and generate new estimates that did not include the falsified data.

52.    Nielsen Audio incurred additional harm to its reputation and expense in having to reassure its subscribers that Bubba Clem's scheme had been discovered and stopped, that the falsified data was removed, and that the September 2015 ratings the subscribers received were unaffected.

53.    By reason of the foregoing, Nielsen Audio was damaged in an amount not less than $1,000,000, the exact amount to be determined at trial.

54.    The actions of Bubba Clem and of BRN were of such a willful, wanton and malicious nature that Nielsen Audio is entitled to an award of punitive damages in order to deter the Defendants and others similarly situated from engaging in such conduct in the future, the amount of such punitive damages to be determined at trial.

Wherefore Nielsen Audio respectfully demands judgment for compensatory and punitive money damages against Bubba Clem and BRN in an amount to be decided at trial and for any and all such further relief as this court deems necessary and appropriate.

### *COUNT II*
#### *Tortious Interference with Business and Contractual Relations With Beasley*
#### *(Bubba Clem and BRN)*

55.    Nielsen Audio repeats the general factual allegations contained in paragraphs 1 through 43 as if fully set forth at length herein.

56.    This is a cause of action seeking money damages against Bubba Clem and BRN for their tortious interference with Nielsen Audio's contractual and business relationships with Beasley.

57.    Nielsen Audio and Beasley are parties to a series of agreements pursuant to which Nielsen Audio licenses its audience measurement reports and provides related services for Beasley's radio stations throughout the United States, including WBRN-FM, one of its stations

in the Tampa-St. Petersburg Florida radio market. Bubba Clem and BRN are not parties to those agreements.

58.     Nielsen Audio and Beasley have had a longstanding business and contractual relationship. Defendants were aware of the business and contractual relationship between Nielsen Audio and Beasley.

59.     In particular, at all times relevant to this action, Bubba Clem was aware that Beasley is and has been a subscriber to Nielsen Audio's PPM audience estimates and that these services include information about the performance of radio station WBRN-FM on which his program is carried. Bubba Clem was also aware that Nielsen Audio's subscribers, on-air radio personalities such as him, and others affiliated with the subscribers are strictly forbidden from attempting to identify, contacting or in any way influencing Nielsen Audio panelists.

60.     Despite this knowledge, Bubba Clem intentionally, both individually and on behalf of BRN, communicated with multiple Nielsen Audio panelists on an ongoing and systematic basis, directly and through others working on his behalf, with the express purpose of influencing the panelists' listening habits and manipulating the PPM devices so that Bubba Clem's share of the radio listening audience would appear larger than it actually is.

61.     As a result of the actions of Bubba Clem and BRN, Nielsen Audio's business and contractual relationship with Beasley has been harmed. This conduct caused Beasley to be in breach of its License Agreement with Nielsen Audio which resulted in the de-listing of WBRN-FM from the September ratings reports. Nielsen Audio and Beasley were each forced to conduct investigations and expend resources to determine the facts and the full extent of Bubba Clem's ratings distortion activity and to explore remedial measures. Other potential consequences of Bubba's Clem's actions are yet to be determined.

62.     By reason of the foregoing Nielsen Audio has suffered damages in an amount not less than $1,000,000, the exact amount to be determined at trial.

63.     The actions of Bubba Clem and of BRN were of such a willful, wanton and malicious nature that Nielsen Audio is entitled to an award of punitive damages in order to deter the Defendants and others similarly situated from engaging in such conduct in the future, the amount of such punitive damages to be determined at trial.

Wherefore Nielsen Audio respectfully demands judgment for compensatory and punitive money damages against Bubba Clem and BRN in an amount to be decided at trial and for any and all such further relief as this court deems necessary and appropriate.

### COUNT III
### Tortious Interference With Business and
### Contractual Relations With PPM Panelists
### (Bubba Clem and BRN)

64.     Nielsen Audio repeats the general factual allegations contained in paragraphs 1 through 43 as if fully set forth at length herein.

65.     This is a cause of action seeking money damages and injunctive relief against Bubba Clem and BRN for their tortious interference with Nielsen Audio's contractual and business relationships with its PPM panelists.

66.     Nielsen Audio has business and contractual relationships with its PPM panelists. Defendants were aware of these business and contractual relationships between Nielsen Audio and its PPM panelists. Bubba Clem and BRN are not parties to the business and contractual relationships between Nielsen Audio and its PPM panelists.

67.     Bubba Clem, both individually and on behalf of BRN, intentionally and willfully interfered with the business relationships between Nielsen Audio and its PPM panelists.

Panelists who consent to participate in Nielsen's PPM survey agree to use the PPM device according to Nielsen Audio's instructions and are compensated for their participation.

68.     By contacting PPM panelists and instructing them to use the PPM device in a manner different than directed by Nielsen Audio with the express purpose of distorting the listening data sent to Nielsen Audio, Bubba Clem and BRN intentionally interfered with the panelists' participation in the PPM survey as they had agreed with Nielsen Audio, damaging their business relationships with Nielsen Audio.

69.     As a result of this interference, Nielsen Audio was forced to conduct an investigation to determine which listener data may have been affected by the Defendants' tampering and remove that data from its audience estimates.  In at least one instance, Nielsen Audio was forced to internally revise its audience estimates and issue a new report in which one its subscribers, Beasley, was de-listed form the survey.

70.     By reason of the foregoing Nielsen Audio has suffered damages in an amount not less than $1,000,000, the exact amount to be determined at trial.

71.     The actions of Bubba Clem and of BRN were of such a willful, wanton and malicious nature that Nielsen Audio is entitled to an award of punitive damages in order to deter the Defendants and others similarly situated from engaging in such conduct in the future, the amount of such punitive damages to be determined at trial.

72.     As a result of the above actions, Nielsen Audio has suffered and will continue to suffer irreparable harm.  For this reason, Nielsen Audio is also entitled to an order and/or judgment preliminarily and permanently enjoining Bubba Clem and BRN from contacting or attempting to contact any Nielsen Audio panelists or to otherwise interfere with Nielsen Audio's contractual relationships with its panelists.

Wherefore Nielsen Audio respectfully demands judgment for compensatory and punitive money damages against Bubba Clem and BRN in an amount to be decided at trial along with temporary and permanent injunctive relief and for any and all such further relief as this court deems necessary and appropriate.

### COUNT IV
**Conspiracy to Defraud**
**(Bubba Clem and BRN)**

73.    Nielsen Audio repeats the general factual allegations contained in paragraphs 1 through 43 as if fully set forth at length herein.

74.    This is a cause of action seeking money damages against Bubba Clem and BRN for their conspiracy to defraud Nielsen Audio.

75.    Bubba Clem and BRN were engaged in a conspiracy to defraud Nielsen Audio and distort the audience estimates with individuals including but not limited to Fuller and at least one Nielsen Audio PPM panelist with whom Bubba Clem admitted he was in contact.

76.    To this end, Bubba Clem engaged in various deceptive and misleading acts including instructing the Cooperating Panelist (i) to tune his radio to WBRN-FM so the resulting data would overstate the time spent listening to Bubba Clem's program; (ii) to vary the stations so as to avoid detection, even specifying which stations other than WBRN-FM the Cooperating Panelist should select and those which he should avoid; and (iii) how to manipulate the PPM device to defeat the PPM's internal motion sensor, even purchasing radios and other devices which Bubba Clem had shipped to the Cooperating Panelist to carry out his instructions.

77.    Upon information and belief, Bubba Clem also communicated with others, including at least Fuller, to convince Nielsen Audio panelists to participate in his plan and to follow Bubba Clem's directions.

78.     Defendants agreed among themselves and others, including but not limited to Fuller and the Cooperating Panelist, to engage in unlawful acts and all undertook actual and overt actions in furtherance of the conspiracy.

79.     By reason of the foregoing, Nielsen Audio has suffered damages in an amount not less than $1,000,000, the exact amount to be determined at trial.

80.     The actions of Bubba Clem and of BRN were of such a willful, wanton and malicious nature that Nielsen Audio is entitled to an award of punitive damages in order to deter the Defendants and others similarly situated from engaging in such conduct in the future, the amount of such punitive damages to be determined at trial.

Wherefore Nielsen Audio respectfully demands judgment for compensatory and punitive money damages against Bubba Clem and BRN in an amount to be decided at trial and for any and all such further relief as this court deems necessary and appropriate.

### COUNT V
### Florida Deceptive and Unfair Trade Practices Act
### (Bubba Clem and BRN)

81.     Nielsen Audio repeats the general factual allegations contained in paragraphs 1 through 43 above as if fully set forth at length herein.

82.     This is a cause of action seeking money damages, declaratory relief and injunctive relief against Bubba Clem and BRN for deceptive and unfair trade practices in accordance with Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

83.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

84.    As set forth above, Defendants are engaged in the radio industry and their services and product meet the definition of "trade or commerce" as defined by Section 501.203(8) of FDUTPA.

85.    Bubba Clem's acts described above were intended by him, both individually and on behalf of BRN, to cause the Nielsen Audio audience estimates to overstate the listening audience for his program for his personal gain and for the financial gain of BRN.

86.    Bubba Clem's ratings tampering deceived Nielsen Audio, and was  intended to deceive all those in the radio industry who rely on the audience estimates and station rankings published by Nielsen Audio including those who set advertising rates and make programming decisions based upon the results of the Nielsen Audio ratings.   Bubba Clem's actions were designed to enhance the value of his program and of BRN to Beasley and other radio stations that purchase his program throughout the country as well as to advertisers.

87.    All of Bubba Clem's actions relative to this lawsuit were done on his own behalf and on behalf of BRN for their mutual benefit.

88.    Bubba's Clem's actions described herein constitute a violation of Fla. Stat. § 501.204(1).

89.    As a result of Defendants' deceptive, unconscionable and unfair acts and practices, Nielsen Audio has been irreparably harmed.   If Defendants' actions are allowed to continue, Nielsen Audio will suffer additional irreparable harm for which there is no adequate remedy at law.

90.    Given the totality of the circumstances including Bubba Clem's public confession of his wrongdoing, Nielsen Audio has a substantial likelihood of success on the merits of this claim.

91.     Nielsen Audio is entitled to recover reasonable attorneys' fees for prosecuting this lawsuit for injunctive relief arising out of the Defendants' deceptive and unfair practices pursuant to Fla. Stat. § 501.2105.

92.     By reason of the foregoing, pursuant to §501.211, Nielsen Audio is entitled to judgment declaring that the actions of Bubba Clem and BRN violate this part and to an order preliminarily and permanently enjoining and restraining Bubba Clem and BRN from committing any further such acts intended to distort the ratings.

93.     By reason of the foregoing, Nielsen Audio is also entitled to recover its actual damages in an amount to be determined at trial but in no event less than $1,000,000, the exact amount to be determined at trial, plus attorney's fees and court costs as provided in §501.2105.

Wherefore Nielsen Audio respectfully demands judgment declaring that the actions of Bubba Clem and BRN violate FDUTPA, for compensatory and punitive money damages against Bubba Clem and BRN in an amount to be decided at trial, an award of its reasonable attorney's fees and costs along with temporary and permanent injunctive relief and for any and all such further relief as this court deems necessary and appropriate.

Mark J. Ragusa, Esq.
Florida Bar No.: 0829633
GUNSTER, YOAKLEY & STEWART, P.A.
401 E. Jackson Street, Suite 2500
Tampa, FL 33602
(813) 222-6619; Fax: (813) 228-6739
E-mail:       mragusa@gunster.com
Trial Attorneys for Plaintiff, Nielsen Audio, Inc.