**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

NIELSEN AUDIO, INC.,

      Plaintiff,

v.                              CASE NO. 8:15-CV-2435-T-27AAS

BUBBA CLEM and
BUBBA RADIO NETWORK, INC.,

      Defendants.

_____/

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

NIELSEN AUDIO, INC.,

      Plaintiff,

v.                                  CASE NO. 8:15-CV-2435-T-27AAS

BUBBA CLEM and
BUBBA RADIO NETWORK, INC.,

      Defendants.

_____/

BUBBA CLEM and
BUBBA RADIO NETWORK, INC.,

      Counterclaimants/
      Third-Party Plaintiffs,

v.

NIELSEN AUDIO, INC.,

      Counterclaim Defendant,

COX MEDIA GROUP, INC. and
MICHAEL CALTA,

      Third-Party Defendants.

_____/

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Defendants/Counterclaimants/Third-Party Plaintiffs BUBBA CLEM and BUBBA RADIO

NETWORK, INC., by and through their undersigned counsel, hereby file this Counterclaim and

Third-Party Complaint against Plaintiff/Counterclaim Defendant NIELSEN AUDIO, INC. and

Third-Party Defendants COX MEDIA GROUP, INC. and MICHAEL CALTA, and allege:

## THE PARTIES

1.      Bubba Clem is an individual who resides in Pinellas County, Florida.  Clem is a well-known radio personality and the host of an internationally-syndicated radio show known as the Bubba the Love Sponge® Show.

2.      Bubba Radio Network, Inc. ("BRN") is a Florida corporation with its principal place of business located at 5021 West Nassau Street, Tampa, Florida 33607.  BRN owns and produces the Bubba the Love Sponge® Show and syndicates the show throughout the United States and Canada.

3.      Nielsen Audio, Inc. ("Nielsen") (f/k/a Arbitron, Inc.) is a Delaware corporation with its principal place of business located at 9705 Patuxent Woods Drive, Columbia, Maryland 21046.  Nielsen is authorized to do business in the State of Florida and maintains offices located at 501 Brooker Creek Boulevard, Oldsmar, Florida 34677.  Nielsen publishes opinions about audience size and composition for radio stations located in markets throughout the United States, including in the Tampa-St. Petersburg-Clearwater market (the "Tampa Market").

4.      Cox Media Group, Inc. ("Cox"), a subsidiary of Cox Enterprises, is a Delaware limited liability company with its principal place of business located at 6205 Peachtree Dunwoody Road in Atlanta, Georgia. Cox is an integrated broadcasting, publishing, direct marketing and digital media company that includes the national advertising rep firms of CoxReps. Upon information and belief, Cox currently owns and operates 14 broadcast television stations and 57 radio stations in more than 20 media markets – including WHPT-FM 102.5 in the Tampa Market.

5.      Michael Calta is an individual who, upon information and belief, resides in Pasco County, Florida.  Calta is an employee of Cox and the host of the Mike Calta Show, a morning radio show on WHPT 102.5.

2

## RELEVANT NON-PARTIES

6.     Kim Guthrie is an individual who, upon information and belief, resides in New York. Guthrie is currently the president of Cox. Guthrie previously served as Cox's executive vice president of National Ad Platforms and president of CoxReps – the biggest television rep firm in the United States, with over $3 billion in revenue.

7.     Keith Lawless is an individual who, upon information and belief, resides in Hillsborough County, Florida. Lawless is a vice president of Cox and its Tampa Market Manager.

8.     ████████████ is an individual who, upon information and belief, resides in Pinellas County, Florida.

9.     Randy Hahn is an individual who, upon information and belief, resides in Arizona.

10.    Beasley Media Group, a subsidiary of Beasley Broadcast Group, Inc., ("Beasley") is a radio broadcasting company that owns and operates radio stations in various markets, including WBRN-FM 98.7 in the Tampa Market.

11.    The Media Rating Council ("MRC") is a non-profit industry association established in 1963. Measurement services desiring MRC Accreditation are required to disclose to their customers all methodological aspects of their service; comply with the MRC Minimum Standards for Media Rating Research and other standards MRC produces; and submit to MRC-designed audits to authenticate and illuminate their procedures.

12.    Upon information and belief, at all times relevant to this action, Calta, Guthrie, Lawless, ██████ and Hahn were agents of Cox; and in doing the things alleged herein, were acting within the scope of such agency and with the permission and consent of Cox.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §

1332 in that this is an action between citizens of different states and the amount in controversy exceeds $75,000.

14.     Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this District, Counterclaim Defendant and Third-Party Defendants are subject to personal jurisdiction in this District, and Counterclaim Defendant and Third-Party Defendants regularly engage in and solicit business in this District.

15.     All conditions precedent to initiating this action have been performed, excused, or waived.

## GENERAL ALLEGATIONS

**A.     Nielsen Audience Measurement And Ratings Services**

16.     Nielsen has a monopoly over radio audience measurement and ratings services nationally, including in the Tampa Market.

17.     In the Tampa Market, Nielsen primarily uses a device called a Portable People Meter ("PPM") to estimate radio audiences.  A PPM is a portable device that captures a PPM panelist's exposure to radio broadcasts by detecting an inaudible code embedded in the audio content of the broadcasts.

18.     Nielsen's subscribers include radio stations, advertisers and advertising agencies. Advertising agencies, media buyers and advertisers use the data to decide whether to purchase advertising on the various competing stations based on the size and demographics of their respective listening audiences.

19.     Radio stations, such as Beasley's WBRN and Cox's WHPT, use Nielsen's ratings opinions to compete for revenue through the sale of advertising.  Nielsen's ratings opinions are

also used by radio stations to aid them in making programming decisions.

**B.      Clem And BRN**

20.      From January 2008 to December 31, 2014, Clem and BRN were under contract with Cox.  Pursuant to their contract, Clem hosted the Bubba the Love Sponge® Show on Cox-owned radio stations, including on WHPT 102.5 in Tampa, and was consistently rated as the No. 1 morning radio personality in the Tampa Market.

21.      In August 2014, Cox elected not to renew its contract with Clem and BRN, and to move WHPT's afternoon show, the Mike Calta Show, to its morning drive segment (6:00 to 10:00 AM) in place of the Bubba the Love Sponge® Show.

22.      Shortly after leaving WHPT, Clem and BRN entered into contracts with Beasley under which the Bubba the Love Sponge® Show would air in the Tampa Market during WBRN's morning drive segment. Clem and the Bubba the Love Sponge® Show made its debut on WBRN on or about January 5, 2015.

**C.      WHPT's Ratings Before And After Clem's Departure**

23.      During the six-year period in which Clem and BRN were under contract with Cox, the Bubba the Love Sponge® Show on WHPT was the No. 1 rated morning show in the Tampa Market nearly every month with Persons and Men 25 to 54 – both highly sought-after, advertiser-friendly demographics and WHPT and WBRN's target audience.

24.      In or around August 2014, at the time Clem and BRN's contract was non-renewed by Cox, WHPT was also No. 1 in advertising billings in the Tampa Market according to advertising revenue reports prepared by the accounting firm of Miller Kaplan Arase LLP.

25.      WHPT's ratings and advertising revenue dropped significantly after Cox removed Clem from the air in late August 2014 and moved the Mike Calta Show to the morning drive.

26.     In fact, from October to December 2014, WHPT's share among men ages 25-54 were: 8.0%, 7.4%, and 7.7%, respectively.  Importantly, WHPT's December 2014 share for its morning drive segment amounted to only about 56.6% of the share it had received during Clem's final month at WHPT.

27.     Moreover, after Clem and BRN's contract with Cox terminated on December 31, 2014, and Clem and the Bubba the Love Sponge® Show debuted on WBRN on January 5, 2015, WBRN quickly surpassed WHPT in the ratings for the morning radio shows being broadcasted in the Tampa Market.

28.     As shown by the table below, WBRN began beating WHPT in the ratings for the Persons 25-54 demographic by March 2015, and continued to do so until at least June 2015, which is approximately the same period of time that Nielsen and Cox entered into a conspiracy to remove Clem from the air in the Tampa Market:

| MONTH | WBRN | WHPT |
|---|---|---|
| January | | |
| February | | |
| March | | |
| April | | |
| May | | |
| June | | |

29.     Similarly, as shown by the table below, WBRN also began beating WHPT in the ratings for the Men 25-54 demographic by May 2015:

| MONTH | WBRN | WHPT |
|---|---|---|
| January | | |
| February | | |
| March | | |
| April | | |
| May | | |
| June | | |

30.     Cox's management team in the Tampa Market, including Guthrie and Lawless,

were extremely disappointed that WHPT was no longer able to achieve the same success in the ratings that it had when Clem was the host of its morning drive show. In an effort to reclaim WHPT's No. 1 status in the Tampa Market, Cox, acting through its agents, including Guthrie and Lawless, set out to eliminate Clem as competition in the Tampa Market.

**D.     Calta Defames Clem And BRN During A Live On-Air Telephone Call**

31.     On April 22, 2015, both WBRN and WHPT aired a live telephone call between Clem and Calta.

32.     During the call, Calta, acting within the scope of his agency and with the permission and consent of Cox, falsely claimed that WBRN's ratings were improving because Clem was tampering with the ratings. Specifically, Calta made the following false statements about Clem:

(a)     that Clem was cheating Nielsen's ratings system;

(b)     that Clem had control over PPMs;

(c)     that Clem had PPMs on watch winders in a shed and/or a shipping container;

(d)     the Clem had purchased a PPM from his dentist's nurse; and

(e)     that after Clem left WHPT, he stopped using the PPMs he allegedly had control over to benefit WHPT, causing its ratings to fall.

33.     Cox encouraged Calta's on-air defamatory statements about Clem. Cox clearly adopted Calta's defamatory statements as well. This is demonstrated by the fact that after the statements were made by Calta on WHPT's morning show, Cox archived a tape of the live on-air conversation between Calta and Clem and promoted it on their website and on various social media outlets as the "Mike Calta Show Featured Cut" and directed their audience and various news agencies to "[h]ear Mike Calta put Bubba in his place."

34.     Nielsen fully investigated Calta's defamatory statements about Clem. As part of its investigation, Nielsen ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████.

35.    On or about May 5, 2015, Nielsen ██████████████████████

████████████████████████████████████████████

██████. Nielsen ████████████████████████████████.

**E.    Internal Fraud Affecting Nielsen's Ratings In The Tampa Market**

36.    During the time period relevant to this action, Nielsen ████████████████

████████████████████████████████████████████.

37.    Nielsen's handling of these issues raises serious doubts as to Nielsen's credibility

as an unbiased, objective provider of audience measurement services.   For example, Nielsen

████████████████████████████████████████████

████████████████████████████████[1] ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████.

38.    Additionally, in or around June 2015, Nielsen ██████████████████

████████████████████████████████████████████

---

[1] Although not pertinent to the time period relevant here, it bears mentioning that after making this discovery, Nielsen ██████████████████████████████████████████████.
This is demonstrated by the fact that in January 2016, Nielsen ████████████████████.

████████████████████████████████████████████████

████. Nielsen knew ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

39.     Nielsen also knew that concealing ███████████████

████████████████████████████████████████████████

████████████████████████. Indeed, ████████████, a Nielsen ████████ expressly

acknowledged ███████████████████████████████████

██████████████████████████████████████████." Nevertheless,

Nielsen never disclosed ██████████████████████████████

████████████████████████████████████████████████

███████████████████████████.

40.     ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████:

████████████████████████████████████████



41.   Furthermore, at some point between June and October 2015, Nielsen ████. At the time, Nielsen finally discovered this incident, ████.

———————————————

[2] *MRC Minimum Standard* A.2 provides as follows:

> **A.   Ethical Operational Standards**
>
> 1.   Appropriate quality control procedures shall be maintained with respect to all external and internal operations which may reasonably be assumed to exert significant effects on the final results.
>
> 2.   Quality control shall be applied to, but not necessarily limited to, sample selection, sample implementation, data collection, data editing, data input, tabulation and data delivery in printed and electronic formats. It shall include (where relevant) periodic independent internal verification of field work and periodic accuracy checks of meter performance and computer accumulations of base data.

42.    As it did with respect to the incident described in paragraph 39 (above), ███



**F.    Nielsen And Cox Enter Into A Conspiracy To Inflict Harm On Clem And BRN**

43.    Upon information and belief, sometime in early 2015, Nielsen entered into a conspiracy with Cox to, among other things: (i) utilize Nielsen's monopoly power over the audience measurement and ratings for the Tampa Market to eliminate Clem from broadcasting on WBRN in competition with WHPT; (ii) tortiously interfere with Clem and BRN's contractual relationships with Beasley and their other affiliates; (iii) tortiously interfere with Clem and BRN's current and prospective business relationships with WBRN's advertisers and US-based syndication partners; (iv) improperly manipulate Nielsen's ratings for the Tampa Market to simultaneously increase WHPT's share to the benefit of Cox, while decreasing the share of WBRN to the detriment of Beasley, Clem and BRN; (v) publish knowingly false, defamatory allegations of ratings distortion activities against Clem and BRN in an effort to, among other things, conceal the fraudulent conduct of Nielsen's employees and the monthly ratings reports; and (vi) engage in unfair methods of competition and various related unconscionable, deceptive, and unfair acts or practices in violation of Chapter 501 of the Florida Statutes that were intended to simultaneously benefit Cox and harm Beasley, Clem and BRN.

44.    Upon information and belief, Cox, acting through its agents, including Guthrie and Lawless, used its position as a large Nielsen subscriber to influence Nielsen into agreeing to

participate in the conspiracy. Nielsen's internal documents █████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

     45.     Upon information and belief, Cox's motive for conspiring with Nielsen to inflict

harm on Clem and BRN was, among other things, (i) WHPT's failure to achieve the same ratings

success that it enjoyed throughout its contract with Clem and BRN; and (ii) Cox's management

team's need to justify their decision not to renew Clem (a long-time No.1 rated morning radio

personality in the Tampa Market) and replace him with Calta (a radio personality who had never

achieved ratings success as a morning show radio personality).  The significance of this decision

not to renew Clem was undoubtedly apparent to both Cox and Nielsen, ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████

     46.     Nielsen's motivation for participating in the conspiracy with Cox was three-fold:

(i) to appease Cox, one of its largest customers, by using its monopoly power to interfere with

Clem's contractual relationship with Beasley and artificially increasing WHPT's share in the

Tampa Market; (ii) to encourage Cox to enter into new contracts to purchase expensive products

and services from Nielsen; and (iii) to conceal the fraudulent conduct committed by its own

employees and the various other serious flaws in its ratings methodology caused by, among other

things, Nielsen's internal policies that promote the manipulation of ratings for the benefit of larger

clients and its total failure to maintain and/or implement and/or fairly apply quality control

procedures.

***Nielsen De-Installs PPM Panelists Who Are Heavy Listeners Of Clem And WBRN***

47.    In furtherance of its conspiracy with Cox, Nielsen ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████.

48.    On or around June 18, 2015, Nielsen de-installed ████████████

████████████████████████████████████████████████████████

███████████████████████.

49.    Nielsen's unwarranted de-installation of these ██████████████

████████████████████████████████████████████████████████

████████.

50.    Nielsen admitted on several occasions ███████████████████

███████████████████████████████ Upon information and belief,

Nielsen's sole basis for de-installing ███████████████████████████

████████████████████████████████.

51.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

52.     Significantly, Nielsen later permitted ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████.

53.     Nielsen's decision ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

54.     Nielsen also ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

***Nielsen And Cox Conspire To Conduct A "Sting" Operation Designed To Entrap Clem Into Engaging In Ratings Distortion Activity***

55.     Over the course of several telephone calls between Cox and Nielsen from May to August 2015, Cox and Nielsen concocted a plan to conduct a "sting" operation designed to entrap Clem into engaging in ratings distortion activity.

56.     Upon information and belief, the sting operation planned by Cox and Nielsen was to involve the purported inclusion of a third party onto Nielsen's Tampa PPM panel who would be directed by Cox and Nielsen to approach Clem and his staff on several occasions while wearing a PPM device with the goal of enticing them into engage in ratings distortion activities.

57.     Nielsen eventually selected ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████.

58.     At the time Nielsen selected █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████.

59.     On or about July 29, 2015, Nielsen █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████.

　　　█████ Nielsen's ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

61.　　As Nielsen well knew and ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████.

62.　　On August 13, 2015, ███████████████████████

███████████████████████████████████████████

██████"

63.　　The next day, on August 14th, █████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████"

64.　　On August 14, 2015, Cox reported to Nielsen that a PPM panelist in the Tampa

Market (i.e., ████████) had contacted it to report that Clem was engaging in ratings distortion

activity.  That same day, Cox arranged a meeting between ███████ and a member of Nielsen's

security team for August 18th.



    65.    On August 17, 2015, ███████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████"

    66.    On Tuesday, August 18, 2015 ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████.

    67.    The meeting at Nielsen █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████"

    68.    On September 21, 2015, Nielsen sent Beasley ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████.

    69.    Thereafter, on September 25th, Nielsen leaked to the press that it was investigating

Clem for allegations that he tampered with ratings. Upon information and belief, Nielsen

intentionally leaked this information to the press three days before Beasley's deadline to provide

a written response to Nielsen's notice of allegations of ratings distortion activities in furtherance of its conspiracy with Cox and for the sole purpose of attempting to influence Beasley to terminate Clem and BRN and thereby eliminate him as competition to Cox.

70.     Nielsen admits that none of the PPM data obtained from any PPM panelist alleged to have engaged in ratings tampering activities with Clem was ever included in any of its monthly ratings reports and, therefore, it was unnecessary for Nielsen to reprocess or reissue any of its monthly ratings reports as a result of the ratings tampering activities allegedly engaged in by Clem.

71.     Nevertheless, at the urging of Cox, Nielsen imposed its most severe response to the alleged ratings distortion activity by delisting Beasley's WBRN for the month of September 2015. Significantly, there have been several other instances involving on-air radio personalities who have been accused of engaging in conduct similar to that which Clem is alleged to have engaged in here (i.e., ratings distortion activity involving a PPM panelist). However, WBRN is the first and only radio station in a PPM market that Nielsen has ever de-listed for any reason. Notably, de-listment is Nielsen's most severe sanction and its imposition against WBRN is further evidence of Nielsen's conspiracy with Cox, as it is undisputed that Nielsen's monthly ratings reports were not compromised or affected as a result of any conduct allegedly engaged in by Clem or BRN.

**G.      Beasley Notifies Nielsen Of Its Decision Not To Terminate Its Contract With Clem**

72.     On ████████████, Beasley notified Nielsen that it had decided not to terminate its contract with Clem ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████.

73.     In response to this notification, and in furtherance of its conspiracy with Cox,

Nielsen notified Beasley ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ On ████████, after Nielsen had informed ████ of Beasley's decision not to

terminate Clem, ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████



76.    Shortly thereafter, Nielsen ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████.

77.    On October 15, 2015, Nielsen filed the instant action against Clem and BRN. Upon

information and belief, Nielsen filed this action against Clem and BRN at the urging of Cox and

its agents, and in furtherance of its conspiracy with Cox to eliminate Clem as competition to

WHPT. Notably, this action represents the first and only time Nielsen has ever filed a suit against

a radio personality for allegedly engaging in ratings distortion activity.

**H.    Nielsen Publishes Defamatory Statements Concerning Clem In Furtherance Of Its Conspiracy With Cox**

78.    On November 2, 2015 – after having failed to bring about the termination of Clem's

contract with Beasley and thereby eliminate him as competition to Cox through the conduct

mentioned above (i.e., leaking to the press that it was investigating Clem prior to receiving

Beasley's response to the allegations; publishing a Product Notification and delisting WBRN for

the month of September; including a notation in its ratings reports for every other BRN syndication

market with regard to the alleged tampering even though there were no allegations of tampering

in those markets; and filing the instant lawsuit against Clem) – Nielsen published a second Product

Notification stating that it had decided to de-list WBRN for an additional month based on alleged

"further evidence of panel-tampering attempts by [Clem]."

79.    Specifically, Nielsen's second Product Notification stated as follows:

> As a result of Rating Distortion activities in the form of attempted
> panel tampering by a syndicated personality at WBRN-FM, Nielsen
> did not report audience estimates for WBRN-FM in the September
> 2015 Tampa-St. Petersburg-Clearwater PPM Radio Market Report.
>
> ***Nielsen has further evidence of panel tampering attempts by this
> syndicated personality.*** Nielsen has assessed the evidence of these
> additional panel tampering attempts in context with the previously

> disclosed panel tampering efforts that were acknowledged by this
> personality. As a result of these additional activities, and pursuant
> to Nielsen's Rating Distortion guidelines, Nielsen is not reporting
> audience estimates for WBRN-FM in the October 2015 Tampa-St.
> Petersburg-Clearwater PPM Radio Market Report.

(Emphasis added.)

80.     The Product Notification defames Clem in that it falsely implies that Nielsen had

discovered evidence of new, current, and ongoing panel tampering attempts by Clem; when in

reality, Nielsen knew that it did not have any "further evidence" of any new, current, or ongoing

"panel tampering attempts" made by Clem.

81.     On information and belief, Nielsen's decision to exclude WBRN from its October

2015 ratings was imposed by Nielsen in furtherance of its conspiracy with Cox to eliminate Clem

as competition to Cox, and for the purpose of punishing Beasley for not terminating its contract

with Clem and BRN.

82.     By failing to include WBRN's ratings information in its October 2015 radio market

report, Nielsen substantially impaired WBRN's ability to compete and operate on an equal basis

with the other stations in the Tampa Market and therefore caused Clem and BRN to incur

substantial monetary damages and restrained their ability to compete for the sale of advertising.

83.     In addition, Clem and BRN have been unable to procure additional broadcast

syndication agreements with any U.S.-based radio broadcaster as a result of Nielsen and Cox's

conduct as set forth herein.

**I.     Cox Continues to Pressure Nielsen To Impose Additional Unwarranted Sanctions
Against Beasley In Order To Leave Beasley With No Choice But To Terminate Clem**

84.     Despite the substantial benefit Cox has derived and the corresponding harm caused

to Beasley, Clem, and BRN as a result of its conspiracy with Nielsen, Cox was unsatisfied when

Nielsen's pressure on Beasley was not successful in bringing about the termination of Clem and

BRN's contract with Beasley because Cox stood to significantly increase its advertising revenue if Clem and BRN were eliminated as competitors to WHPT in the Tampa Market. As such, Cox continued to use its status as a large Nielsen subscriber to pressure Nielsen to impose additional sanctions against Beasley such that Beasley would be left with no choice but to terminate its contract with Clem and BRN.

85. Upon information and belief, Nielsen ████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████.

86. Nevertheless, upon information and belief, ███████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████"
      ████████████   ████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

88.     Upon information and believe, Nielsen ████████████████████████████████

████████████████████████████████████████████████ .

89.     Specifically, on October 6, 2016, Nielsen sent a letter to Beasley, which forwarded same to Clem and BRN, to notify them that it deemed certain comments made by Clem on September 21, 2016, concerning his disappointment that the audience estimates reported by "the ratings company" (i.e., Nielsen) for the show's female audience, combined male and female audience, among Persons 25-54; significantly, such comments are repeatedly expressed by numerous radio show hosts throughout the country.  In the letter Nielsen wrongfully claims that Clem's comments "make clear his view that the ratings company underreported his program's female panelists and "prompt WBRN listeners to agree to become panelists . . . as a gesture of support."

90.     On October 21, 2016, Nielsen notified Beasley that it intended to, and did, note on the special notices page of the October 2016 Tampa-St. Petersburg-Clearwater eBook the comments broadcast by Clem on September 21, 2016.

91.     Moreover, upon information and belief, Nielsen also began suppressing the ratings for WBRN, and all of Beasley's other radio stations in the Tampa Market, by manipulating their data in such a way that the radio stations rapidly declined in the ratings and were unable to achieve

the same level of success as they had consistently achieved previously.

92.     Based on the continuing pressure by Nielsen, which, upon information and belief, was in furtherance of its conspiracy with Cox, on December 9, 2016, Beasley terminated its contract with Clem and BRN via letter, which cites, among other things, Nielsen's decision to include the special notice in its October 2016 eBook and Nielsen's continued suppression of Clem's ratings, which – as Nielsen and its co-conspirators intended – caused "WBRN's revenue to continue to be substandard, causing WBRN to suffer significant cash flow loss."

**J.      Clem and BRN Have Been Damaged As A Result Of Nielsen And Cox's Conspiracy**

93.     Clem and BRN have incurred substantial damages as a result of the conspiracy between Nielsen and Cox, including but not limited to: (i) lost income; (ii) lost advertising revenue; (iii) lost relationships with current and prospective advertisers; (iv) lost value in its contracts with Beasley; and (v) lost relationships with syndication partners and new prospective syndication markets.

94.     Additionally, Clem and BRN has and will continue to incur damages as a result of Nielsen's ongoing efforts to unfairly suppress Clem's ratings by systematically refusing to install any new panelist who it believes to be a listener of Clem.  The scope and extent of such damage is difficult to quantify, but will be established at trial.

95.     Clem and BRN will also continue to incur damage to their reputations and goodwill in the radio industry as long as Nielsen and Cox, and those working in conjunction with them, continue to defame them in an effort to manipulate the ratings to unfairly disadvantage Clem and BRN, and to benefit Cox.  The scope and extent of such damage is difficult to quantify, but will be established at trial.

## COUNT I
## DEFAMATION
### (Against Nielsen and Cox)

96.    Clem and BRN incorporate by reference paragraphs 1 through 95 of this Counterclaim and Third-Party Complaint, as though fully set forth herein.

97.    This is an action against Nielsen for defamation through which Clem seeks to recover money damages in excess of $75,000, exclusive of interest, costs, and attorneys' fees.

98.    As noted above, on or about November 2, 2015, Nielsen published a Product Notification that stated it was de-listing WBRN for the month of October 2015 based on its alleged discovery of "further evidence of panel-tampering attempts by [Clem]."

99.    The Product Notification defames Clem and BRN in that it falsely implies that Nielsen had discovered evidence of new, current, and ongoing panel tampering attempts by Clem; when in reality, Nielsen knew or reasonably should have known that it did not have any "further evidence" of any new, current, or ongoing "panel tampering attempts" made by Clem.

100.    The statements were made by Nielsen in furtherance of its conspiracy with Cox and with actual malice as they were made and published with knowledge of their falsity or reckless disregard as to whether they were true or false, and because they were made with ill-will, hostility, and the intent to defame and or cause substantial injury to Clem and BRN.

101.    Nielsen's defamatory statements have been disseminated to diverse media outlets, including but not limited to, newspapers, radio, television, and the internet; and have subjected Clem and BRN to hatred, distrust, ridicule, contempt, disgrace and have injured their professional reputations and goodwill in the radio industry.

102.    Nielsen's defamatory statements were of such a willful, wanton and malicious nature that Clem and BRN are entitled to an award of punitive damages in order to deter Nielsen,

and others similarly situated from engaging in such conduct in the future, the amount of such punitive damages to be determined at trial.

103.   As a proximate result of the publication of Nielsen's defamatory statements, Clem and BRN have been injured.

**WHEREFORE,** Clem and BRN demand judgment against Nielsen as follows:

A.   For damages in an amount to be determined at trial;

B.   For punitive damages in an amount to be determined at trial;

C.   For reasonable attorneys' fees and court costs; and

D.   For such other and further relief as the Court deems just and proper.

## COUNT II
## DEFAMATION
### (Against Calta and Cox)

104.   Clem and BRN incorporate by reference paragraphs 1 through 95 of this Counterclaim and Third-Party Complaint, as though fully set forth herein.

105.   This is an action against Calta and Cox for defamation through which Clem and BRN seek to recover money damages in excess of $75,000, exclusive of interest, costs, and attorneys' fees.

106.   As noted above, the following statements were published on April 22, 2015 over Cox's WHPT radio station by Calta while acting within the scope of his employment with and the permission and consent of Cox:

(a)   that Clem was cheating Nielsen's ratings system;

(b)   that Clem had control over PPMs;

(c)   that Clem had PPMs on watch winders in a shed and/or a shipping container;

(d)   the Clem had purchased a PPM from his dentist's nurse; and

(e)   that after Clem left WHPT, he stopped using the PPMs he allegedly had

control over to benefit WHPT, causing its ratings to fall.

107.    The statements were made by Calta and Cox with actual malice as they were made

and published with knowledge of their falsity or reckless disregard as to whether the they were

true or false, and because they were made with ill-will, hostility, and the intent to defame and or

cause substantial injury to Clem and BRN.

108.    Calta's defamatory statements have been disseminated to diverse media outlets,

including but not limited to, newspapers, radio, television, and the internet; and have subjected

Clem and BRN to hatred, distrust, ridicule, contempt, disgrace and have injured their professional

reputations and goodwill in the radio industry.

109.    The actions of Calta and Cox were of such a willful, wanton and malicious nature

that Clem and BRN are entitled to an award of punitive damages in order to deter Calta and Cox,

and others similarly situated from engaging in such conduct in the future, the amount of such

punitive damages to be determined at trial.

110.    As a proximate result of the publication of Calta and Cox's defamatory statements,

Counterclaimants have been injured.

**WHEREFORE,** Clem and BRN demand judgment against Cox and Calta, and each of

them, as follows:

A.    For damages in an amount to be determined at trial;

B.    For punitive damages in an amount to be determined at trial;

C.    For reasonable attorneys' fees and court costs; and

D.    For such other and further relief as the Court deems just and proper.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
### (Against Nielsen and Cox)

111.    Clem and BRN incorporate by reference paragraphs 1 through 95 of this

27

Counterclaim and Third-Party Complaint, as though fully set forth herein.

112.    This is an action seeking money damages against Nielsen and Cox for their tortious interference with Clem and BRN's contractual and business relationships with Beasley.

113.    Clem and BRN are parties to a contractual agreement with Beasley pursuant to which Clem hosts and BRN produces Bubba the Love Sponge® Show on WBRN.  (A copy of this contract is attached hereto as Exhibit "A".)

114.    Neither Nielsen nor Cox are parties to the contractual agreement between Clem, BRN and Beasley.

115.    Nielsen and Cox knew of the above described contractual agreement between Clem, BRN and Beasley.

116.    Despite their knowledge of the contractual agreement between Clem, BRN and Beasley, Nielsen and Cox made defamatory statements about Clem and BRN and engaged in a conspiracy to bring about the termination of Clem, BRN and Beasley's contractual agreement on an ongoing and systematic basis, directly and through others working on their behalf, with the express purpose of influencing Beasley to terminate Clem and/or alter its contractual agreement with Clem and BRN and to manipulate Nielsen's ratings reports so that WBRN's share of the radio listening audience would appear much smaller than it actually is in an effort to eliminate Clem and BRN as competition to Cox's WHPT.

117.    As a result of the actions of Cox and Nielsen, Clem and BRN's contract with Beasley has been harmed.

118.    Specifically, as a result of Cox and Nielsen's conduct, Beasley required Clem and BRN to enter into an amended contract containing substantially less favorable rights and terms of compensation than those provided for in their original contract with Beasley.  Other potential

consequences of Cox and Nielsen's conduct are yet to be determined.

119.    As a result of Nielsen and Cox's conduct, and the conduct of those working in conjunction with them, Clem and BRN have suffered damages in an amount exceeding $75,000, the exact amount to be determined at trial.

120.    The actions of Cox and Nielsen were of such a willful, wanton and malicious nature that Clem and BRN are entitled to an award of punitive damages in order to deter Calta and Cox, and others similarly situated from engaging in such conduct in the future, the amount of such punitive damages to be determined at trial.

121.    Nielsen and Cox have threatened to and unless restrained will continue their efforts to disrupt Clem and BRN's contractual relationship with Beasley to Clem and BRN's great irreparable injury, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to Counterclaimant's business reputation and goodwill.

**WHEREFORE,** Clem and BRN demand judgment against Nielsen and Cox as follows:

A.    For damages in an amount to be determined at trial;

B.    For punitive damages in an amount to be determined at trial;

C.    For reasonable attorneys' fees and court costs; and

D.    For such other and further relief as the Court deems just and proper.

### COUNT IV
### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS
### (Against Nielsen and Cox)

122.    Clem and BRN incorporate by reference paragraphs 1 through 95 of this Counterclaim and Third-Party Complaint, as though fully set forth herein.

123.    This is an action seeking money damages against Nielsen and Cox for their tortious interference with Clem and BRN's contractual and business relationships with the purchasers of

advertising on the Bubba the Love Sponge® Show on WBRN.

124.    Clem and BRN have business and contractual relationships with the purchasers of advertising on WBRN, including but not limited to, McDonald's, Omaha Steaks and several other large corporate advertisers.

125.    Neither Nielsen nor Cox are parties to the business and contractual relationships between Clem and BRN and the purchasers of advertising on the Bubba the Love Sponge® Show on WBRN.

126.    Nielsen and Cox knew of the above described business and contractual agreements between Clem, BRN and the purchasers of advertising on the Bubba the Love Sponge® Show on WBRN.

127.    Despite their knowledge of the contractual agreement between Clem, BRN and the various purchasers of advertising on the Bubba the Love Sponge® Show on WBRN, Nielsen and Cox have made and continue to make defamatory statements about Clem and BRN, including but not limited to those set forth above, and to engage in a conspiracy to bring about the termination of Clem and BRN's business and contractual relationships with their advertisers by, among other things, manipulating Nielsen's ratings so that WBRN's share of the radio listening audience would appear much smaller than it actually is in order to discourage advertisers from continuing their business and contractual relationships with Clem and BRN.

128.    On an ongoing and systematic basis, directly and through others working on their behalf, Cox and Nielsen engaged in conduct intended to influence Clem and BRN's advertisers to terminate their business and contractual relationships with Clem and BRN.

129.    As a result of the actions of Cox and Nielsen, Clem and BRN's contracts with its advertisers and prospective advertisers have been harmed in that several large corporate

advertisers, including McDonalds, Omaha Steaks as well as numerous prospective advertisers have terminated their business and contractual relationships with them.

130.     As a result of Nielsen and Cox's conduct, and the conduct of those working in conjunction with them, Clem and BRN have suffered damages in an amount exceeding $75,000, the exact amount to be determined at trial.

131.     The actions of Cox and Nielsen were of such a willful, wanton and malicious nature that Clem and BRN are entitled to an award of punitive damages in order to deter Nielsen and Cox, and others similarly situated from engaging in such conduct in the future, the amount of such punitive damages to be determined at trial.

132.     Nielsen and Cox have threatened to and unless restrained will continue their efforts to disrupt Clem and BRN's contractual relationship with their advertisers to Clem and BRN's great irreparable injury, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to Clem and BRN's business reputations and goodwill in the radio industry.

**WHEREFORE,** Clem and BRN demand judgment against Nielsen and Cox, and each of them, as follows:

A.      For damages in an amount to be determined at trial;

B.      For punitive damages in an amount to be determined at trial;

C.      For reasonable attorneys' fees and court costs; and

D.      For such other and further relief as the Court deems just and proper.

**COUNT V**
**VIOLATION OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT**
**(Against Nielsen, Cox and Calta)**

133.     Counterclaimants incorporate by reference paragraphs 1 through 95 of this

Counterclaim and Third-Party Complaint, as though fully set forth herein.

134.    This is an action against Counterclaim Defendant and Third-Party Defendants for engaging in unfair, deceptive and unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. 501.201, et seq.

135.    The purpose of FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *See* Fla. Stat. § 501.202(2).

136.    FDUTPA therefore prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* Fla. Stat. § 501.204.

137.    Nielsen, Cox and Calta's conduct in defaming Clem and BRN, and using Nielsen's monopoly over the audience ratings industry in the Tampa Market to interfere with Clem and BRN's business and contractual relationships with Beasley and the purchasers of advertising on the Bubba the Love Sponge® Show on WBRN constitutes an unfair method of competition, an unconscionable act or practice, and an unfair or deceptive act or practice in the conduct of trade or commerce.

138.    Clem and BRN have sustained damages as a direct and proximate result of Counterclaim Defendant and Third-Party Defendants' deceptive and unfair trade practices.

139.    Clem and BRN are entitled under section 501.2105, Florida Statutes, to recover their reasonable attorneys' fees.

**WHEREFORE,** Clem and BRN demand judgment against Nielsen, Cox and Calta, and each of them, as follows:

A.     For actual damages in an amount exceeding $75,000, the exact amount to be determined at trial;

B.     To enjoin Nielsen, Cox, and Calta, and anyone acting on behalf of any of them, from continuing to unfairly manipulate the ratings in Tampa or engage in other related anti-competitive acts or practices;

C.     To order Nielsen's methodology and monthly ratings reports for the Tampa Market be audited and, if necessary, corrected, to ensure that the biased, unfair, deceptive, and anti-competitive acts and practices committed by Nielsen in furtherance of its conspiracy with Cox will have no further effect on the monthly ratings reports for the Tampa Market;

D.     For reasonable attorneys' fees and court costs; and

E.     For such other and further relief as the Court deems just and proper.

## COUNT VI
## CIVIL CONSPIRACY
### (Against Nielsen, Cox, and Calta)

140.     Counterclaimants incorporate by reference paragraphs 1 through 144 of this Counterclaim and Third-Party Complaint, as though fully set forth herein.

141.     This is a cause of action seeking money damages against Nielsen, Cox, and Calta for engaging in a civil conspiracy.

142.     Nielsen, Cox and Calta entered into a conspiracy to, among other things, defame Clem and BRN and tortiously interfere with Clem and BRN's business and contractual relationships with Beasley and the purchasers of advertising on the Bubba the Love Sponge® Show on WBRN.

143.     Nielsen, Cox and Calta agreed among themselves and with their co-conspirators to

engage in the unlawful acts alleged herein and all undertook actual and overt actions in furtherance of the conspiracy.

144.    As a proximate result of Nielsen, Cox and Calta's malicious and unlawful actions, and their agreement and conspiracy to commit said actions, Clem and BRN have suffered and will continue to suffer damages in an amount to be proven at trial.

**WHEREFORE,** Clem and BRN demand judgment against Nielsen, Cox and Calta, and each of them, as follows:

A.    For damages in an amount to be determined at trial;

B.    For punitive damages in an amount to be determined at trial;

C.    For reasonable attorneys' fees and court costs; and

D.    For such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Counterclaimants/Third-Party Plaintiffs demand a trial by jury on all issues so triable.

DATED this 16th day of January, 2017.

Respectfully submitted,

/s/ Zachary D. Grimland
Todd Foster, Esq.
Florida Bar No. 325198
Email: tfoster@tfosterlaw.com
Zachary D. Grimland, Esq.
Florida Bar No. 91123
Email: zgrimland@tfosterlaw.com
TODD FOSTER LAW GROUP
1881 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 229-7373
Facsimile: (813) 280-9981
***Attorneys for Defendants/Counterclaimants***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of January, 2016, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will automatically send

email notification of such filing to the following attorneys of record:

Mark Ragusa, Esq.
Gunster, Yoakley & Stewart, PA
401 E. Jackson Street, Suite 2500
Tampa, FL 33602
mragusa@gunster.com
tkennedy@gunster.com

Alfred R. Fabricant (pro hac vice)
Lawrence C. Drucker (pro hac vice)
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
afabricant@brownrudnick.com
ldrucker@brownrudnick.com

*Attorneys for Plaintiff/Counterclaim Defendant*

/s/ Zachary D. Grimland
Todd Foster, Esq.
Florida Bar No. 325198
Email: tfoster@tfosterlaw.com
Zachary D. Grimland, Esq.
Florida Bar No. 91123
Email: zgrimland@tfosterlaw.com
TODD FOSTER LAW GROUP
1881 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 229-7373
Facsimile: (813) 280-9981
*Attorneys for Defendants/Counterclaimants*