IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NIELSEN AUDIO, INC.,

        Plaintiff/Counterclaim-Defendant,

v.                                    Case No.:  8:15-cv-2435-JDW-AAS

BUBBA CLEM a/k/a BUBBA THE
LOVE SPONGE and BUBBA RADIO
NETWORK, INC.,

        Defendants/Counterclaim-Plaintiffs.

_____/

**<u>JOINT PRETRIAL STATEMENT</u>**

COUNSEL FOR THE PARTIES:

Alfred R. Fabricant (*pro hac vice*)
Lawrence C. Drucker (*pro hac vice*)
Sarah G. Hartman (*pro hac vice*)
Jessica Lu (*pro hac vice*)
**BROWN RUDNICK LLP**
7 Times Square
New York, New York 10036
(212) 209-4900
Email: afabricant@brownrudnick.com
      ldrucker@brownrudnick.com
      shartman@brownrudnick.com
      jlu@brownrudnick.com


Mark J. Ragusa
Florida Bar No.:  0829633
**GUNSTER, YOAKLEY & STEWART, P.A.**
401 E. Jackson Street, Suite 2500
Tampa, Florida 33602
(813) 222-6619; Fax:  (813) 228-6739
E-mail: mragusa@gunster.com

*Counsel for Plaintiff*
*Nielsen Audio, Inc.*

Todd Foster
Florida Bar No. 325198
Richard Rodriguez
Florida Bar No. 083546
Jonah Dickstein
Florida Bar No. 27686
**TODD FOSTER LAW GROUP**
1881 W. Kennedy Blvd.
Tampa, Florida 33606
Telephone: (813) 229-7373
Facsimile: (813) 280-9981
Email: tfoster@tfosterlaw.com
      rrodriguez@tfosterlaw.com
      jdickstein@tfosterlaw.com

*Counsel for Defendants Bubba Clem a/k/a*
*Bubba the Love Sponge and Bubba Radio*
*Network, Inc.*

Plaintiff/Counterclaim-Defendant, Nielsen Audio, Inc. ("Nielsen" or "Plaintiff"), and

Defendants/Counterclaim-Plaintiffs Bubba Clem a/k/a Bubba the Love Sponge ("Bubba Clem"

or "BTLS") and Bubba Radio Network, Inc. ("BRN") (collectively "Defendants"), by and

through their undersigned counsel and pursuant to Fed. R. Civ. P. 16 and Local Rule 3.06,

hereby file their Joint Pretrial Statement for approval by the Court in advance of trial scheduled

to commence on March 5, 2018.

## I.    BASIS OF FEDERAL JURISDICTION

The parties agree that this Court has subject matter jurisdiction over this action pursuant

to 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount

in controversy exceeds $75,000 (Dkt. 14 ¶ 6; Dkt. 108 ¶ 7).  Plaintiff Nielsen is a Delaware

corporation with its principal place of business located at 9705 Patuxent Woods Drive, Columbia

Maryland, 21046.  Defendant Bubba Clem is a citizen of the State of Florida and resides in St.

Petersburg, Florida.  Defendant BRN is a corporation organized and existing under the laws of

the State of Florida with its principal place of business located at 5021 West Nassau Street,

Tampa, Florida 33607.  The parties agree that venue is proper in this Court pursuant to 28 U.S.C.

§§ 1391 (b) and (c) (Dkt. 14 ¶ 7; Dkt. 108 ¶ 8).

## II.    CONCISE STATEMENT OF THE NATURE OF THE ACTION

Plaintiff Nielsen is an international media and marketing research firm whose business

includes estimating radio audiences in markets across the United States.  Nielsen collects radio

listening data from survey participants or panelists in radio markets throughout the United States

and produces audience estimates and ratings based on that data.  In certain markets, the data is

collected using a portable electronic device known as the Portable People Meter or "PPM®"

which is carried by panelists and records listening data that is sent back to Nielsen.  The identity

of Nielsen panelists is a closely guarded secret that Nielsen keeps from broadcasters in an effort to avoid any potential bias or distortion of the audience estimates.

Defendant Bubba Clem is a syndicated radio personality who is the host of the Bubba the Love Sponge radio program.  Defendant BRN is a corporation owned in part and controlled by Bubba Clem that is responsible for producing and entering into syndication agreements pursuant to which the BTLS radio program is aired on stations throughout Florida and elsewhere in the United States.

In or about August 2015, a Nielsen survey panelist in Tampa, Florida told Nielsen that Bubba Clem had attempted to influence that panelist's listening data, instructing the panelist how to manipulate the PPM so that the data sent to Nielsen would be artificially inflated in Bubba Clem's favor.  The panelist provided Nielsen with evidence consisting of text messages exchanged between he and Bubba Clem with detailed instructions regarding what stations to listen to at specific times, promises of payment tied to favorable ratings showing that the scheme was working, and physical items Bubba Clem purchased and had sent to the panelist to help him falsify the listening information recorded on the PPM.  After Nielsen confirmed the panelist's statements, in September 2015, Nielsen presented the evidence to Beasley Media Group Inc. ("Beasley"), the broadcaster that carried the Bubba the Love Sponge show on its Tampa station WBRN-FM and in other markets.  Beasley suspended airing the BTLS show for several days and then required Bubba Clem to hold a press conference on October 6, 2015, at which he admitted to having been contacted by a Nielsen panelist and to attempting to influence the listening activities of that panelist.  Nielsen's investigation of this incident led it to determine that Bubba Clem had been in contact with additional Nielsen panelists and had attempted to influence the

listening data provided to it by those panelists to increase his audience estimates and ratings artificially.

On October 15, 2015, Nielsen filed a Complaint (Dkt. 1) to seek relief from harm Nielsen suffered as a result of Defendants' purposeful efforts to manipulate Nielsen's radio audience estimates and station rankings for the Tampa-St. Petersburg-Clearwater market and other radio markets.  Nielsen asserted claims against Defendants for (1) fraud; (2) interference with Nielsen's contractual and business relations with Beasley; (3) interference with Nielsen's contractual and business relations between Nielsen and its survey panelists; (4) civil conspiracy, and (5) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").  Nielsen sought actual and compensatory damages, punitive damages, injunctive relief, declaratory relief, and reasonable attorneys' fees and costs from Defendants.  Nielsen requested a jury trial. Nielsen filed an Amended Complaint (Dkt. 14) on November 27, 2015, asserting the same causes of action and seeking the same damages as the initial Complaint, but adding more detailed allegations regarding Bubba Clem's contacts, on behalf of himself and BRN, with at least five Nielsen panelists in an effort to distort Nielsen's audience listening data in Defendants' favor. Nielsen again requested a jury trial.

Defendants filed their Answer to Nielsen's Amended Complaint on May 31, 2016 (Dkt. 35), denying liability as to each claim and asserting the following affirmative defenses: (1) that the Court lacks subject matter jurisdiction because the amount in controversy does not exceed $75,000; (2) that Nielsen did not plead fraud (Count 1) with particularity; (3) that Nielsen's claims are barred by estoppel; (4) that Nielsen has fully mitigated its damages; (5) that damage to the contractual relationship between Nielsen and Beasley was caused by Nielsen; (6) that Nielsen's claims are barred by lack of privity of contract between Nielsen and Defendants; (7)

that Nielsen's claims are reduced to zero for failure to mitigate its damages; (8) that the Court

lacks jurisdiction to issue an injunction; (9) that Nielsen's claims are barred by unclean hands

and bad faith; (10) that Nielsen's claims are barred by Florida Statutes § 768.295 against SLAPP

suits; (11) that Nielsen cannot state a valid claim for compensatory damages or punitive

damages; and (12) that Nielsen has failed to state claims upon which relief can be granted.

Defendants requested a jury trial.

On March 22, 2017, Defendants filed a Counterclaim (Dkt. 108) asserting claims for (1)

tortious interference with Defendants' contracts and business relationships with Beasley; (2)

tortious interference with Defendants' contracts and business relationships with purchasers of

advertising on the Bubba the Love Sponge show on WBRN-FM and BRN's network; (3)

violation of FDUTPA; and (4) civil conspiracy between Nielsen and Cox Media Group, Inc.

("Cox").  Defendants also requested a jury trial.

Nielsen filed an Answer (Dkt. 162) denying liability as to each counterclaim, and

asserting the following affirmative defenses: (1) that Defendants have failed to state a claim upon

which relief can be granted; (2) that Defendants have failed to plead fraud with particularity; (3)

that the FDUTPA claim is barred because Defendants have not alleged a deceptive or unfair

practice within the scope of the FDUPTA; (4) that Defendants' conspiracy claim fails for failure

to allege the particulars of any agreement between Nielsen and any co-conspirator(s); (5) that

Defendants' counterclaims are barred by laches, estoppel, and waiver; (6) that Defendants'

counterclaims are barred by unclean hands; (7) that Defendants have failed to use reasonable

means to prevent the alleged damages and to mitigate their damages; (8) that Defendants have

suffered no damages proximately caused by Nielsen's alleged actions; (9) that any purported

harm suffered by Defendants resulted from Defendants' own actions and/or the actions of third

parties, not Nielsen; (10) that Defendants' counterclaims are barred by a lack of causation; (11) that Defendants have failed to join an indispensable party, i.e. Cox and/or Cox's employee Mike Calta; (12) that Defendants are not entitled to injunctive relief because any alleged injury to Defendants is not immediate or irreparable, and Defendants have an adequate remedy at law; (13) that Defendants' claim for punitive damages is barred because it seeks to impose an excessive fine within the meaning of the Eighth Amendment to the Constitution of the United States; (14) that Nielsen's alleged actions are not an actionable violation of FDUPTA, as defined in Sections 501.203(3)(a)-(c), Florida Statutes; (15) that any recoverable damages are entitled to a set-off for any judgment or recovery against Defendants under Nielsen's Amended Complaint (Dkt. 14); (16) that Defendants are not "consumers" (as defined in Section 501.203(7), Florida Statutes) of Nielsen's services, nor were they directly aggrieved by Nielsen's alleged violation of FDUTPA; and (17) to the extent any alleged co-conspirator took action on its own behalf, then such action would be lawful and legitimate competition and not actionable.

## III.    BRIEF STATEMENT OF EACH PARTY'S CASE

### A.    Nielsen's Statement of the Case[1]

Plaintiff Nielsen, and its predecessor Arbitron, has been a leader in the field of audience measurement for more than 50 years.  Nielsen collects radio audience listening data by various means from which it formulates detailed estimates as to what radio programming a participating panelist is listening to throughout the day.  Nielsen produces audience estimates and station rankings in databases and reports that Nielsen licenses to subscribers, which include broadcasters, advertisers, advertising agencies, and consultants, among others.  Nielsen's ratings and audience estimates are widely used by broadcasters to determine whether to acquire a

---

[1] Nielsen's statement of the case is set forth more fully in its Amended Complaint (Dkt. 14) at ¶¶ 1 through 79, which is incorporated herein by this reference.

syndicated program; to determine how much to pay for a syndicated programs; to set prices for advertising time; to make programming decisions; to determine which radio personalities to put on and remove from the air; and to determine how much to pay on-air talent.  Nielsen's audience estimates and station ranking are also used by advertisers and advertising agencies to plan advertising budgets and make decisions about where and when to advertise.

In some radio markets, including the Tampa-St. Petersburg-Clearwater market (the "Tampa Market"), Nielsen obtains listening information using its Portable People Meter or PPM® ("PPM").  The PPM is a small, portable device that is worn or carried by the survey participant.  It detects inaudible codes embedded in a broadcast or within an audio stream which identify the radio station and the program being listened to, and creates a log of instances in which those codes are detected.  The information is then transmitted to Nielsen which can identify the broadcasts to which the individual survey participant was exposed throughout the day.  In other markets, Nielsen obtains information by requesting that survey participants manually record their listening data in diaries and then return them to Nielsen.  Nielsen scientifically and randomly selects survey panelists in a particular radio market to be demographically representative of the population in that market.

Nielsen keeps the identity of the panelists confidential and takes measures to ensure that the panelists comply with its procedures.  Only when a panelist complies with these procedures is the panelist's listening data included in the audience estimates.  This is to best ensure that the data incorporated into the audience estimates is untainted and unbiased and reflects the panelists' actual listening habits.  These safeguards are of utmost importance to Nielsen and to its subscribers who rely on the integrity of the process.  Nielsen also goes to great lengths to maintain the integrity of its audience estimates with respect to the actions of its subscribers.  All

of Nielsen's station license agreements contain language expressly forbidding subscribers, including their agents, staff, and other employees or contractors such as on-air talent, from attempting to discover the identity of its survey participants, contacting those individuals, or committing any act that could influence or distort the results of the survey.  The penalties for a subscribing station found to have interfered with the impartiality of the survey include being de-listed (i.e. excluded from the audience estimates for a period of time).  To further ensure that broadcasters avoid any acts that could possibly distort the ratings, Nielsen publishes a "PPM Ratings Distortion & Ratings Bias Handbook" that provides detailed guidelines and procedures for broadcasters to follow to help maintain the credibility and impartiality of its audience estimates.  Broadcasters and on-air radio personalities are aware that there is a temptation to influence the audience estimates and station rankings to gain a competitive advantage in the radio market.  It is standard industry practice for broadcasters to train their on-air talent, as well as programming and sales employees, in the importance of avoiding all contact with Nielsen panelists or to otherwise act in any way that could bias the ratings results.

Defendant Bubba Clem, who legally changed his name from Todd Alan Clem to "Bubba the Love Sponge Clem," hosts a daily radio show known as the Bubba the Love Sponge ("BTLS") Show that is produced in BRN's facility in Tampa.  At the time this action was filed, Bubba Clem's show aired on WBRN-FM in Tampa, a radio station owned and operated by Beasley Broadcasting Group ("Beasley"), and was syndicated for broadcast on numerous stations throughout the United States and available via streaming audio.  BRN owns and produces the Bubba the Love Sponge Show and enters into agreements with radio stations to broadcast Bubba Clem's show, including the licensing agreement with Beasley that allowed Bubba Clem's show to be broadcast on WBRN-FM.

As a radio broadcaster for approximately 30 years, many of which he spent working for Nielsen subscribers, Bubba Clem was aware of the importance of Nielsen's ratings to the radio industry and of maintaining impartiality in the ratings.  Specifically, Bubba Clem was aware that Nielsen prohibited subscribers and their personnel, including any on-air talent, from attempting to learn the identity of any survey participant, contacting any survey participant, and/or engaging in any other act that could influence or distort the results of the survey.  If Nielsen discovered that a subscribing station had interfered with the impartiality of the survey, it could de-list (or exclude) that station from the audience estimates for a period of time.

Beginning in or about 2015, Bubba Clem communicated with several Nielsen PPM panelists and at least one Nielsen diary keeper in an effort to influence the listening data that would be sent to Nielsen to his and BRN's advantage.  Bubba Clem engaged in a fraudulent scheme to manipulate the radio audience estimates and station rankings for the Tampa Market and other radio markets by, among other things, instructing and/or paying members of the Nielsen survey panel to distort the radio audience estimates in Defendants' favor.  Specifically, Nielsen discovered that Bubba Clem had been communicating with Nicholas Tabachuk ("Tabachuk"), a Nielsen PPM panelist in the Tampa Market.  Bubba Clem instructed Tabachuk to listen to specific radio stations at specific times so that Bubba Clem's ratings would be inflated while making it difficult for Nielsen to detect the fraud.  Bubba Clem paid Tabachuk in exchange for his cooperation, and promised bonus payments if Bubba Clem's performance in the Nielsen ratings reached targets set by Bubba Clem.  Bubba Clem purchased items to help Tabachuk use the PPM in ways that it would register false listening data that would be sent back to Nielsen.  In August, 2015, Tabachuk admitted to Nielsen that Bubba Clem had been communicating with him and paying him for his cooperation and provided, among other items,

copies of thousands of text messages exchanged with Bubba Clem urging Tabachuk to follow

Bubba Clem's detailed instructions as to which stations to listen to at specific times of day and

promising payment in return for his cooperation, including promises of bonus payments if

desired ratings were achieved.  Nielsen searched through its raw data to locate the listening data

received from the Tabachuk household, and removed that information from its Tampa survey.  It

also commenced an investigation to obtain further details regarding Bubba Clem's contacts with

Tabachuk, as well as to determine whether Bubba Clem had been in contact with other Nielsen

panelists.  Bubba Clem admits sending and receiving these text messages.

On September 21, 2015, Nielsen provided Beasley with evidence of Bubba Clem's

attempted ratings distortion.  Beasley responded (i) by suspending Bubba Clem's live show on

WBRN-FM, although it continued to air Bubba Clem's broadcasts on its other stations, and (ii)

by issuing a press release on October 5, 2015, condemning Bubba Clem's actions and promising

to implement training sessions to address Nielsen ratings distortion and bias policies to all of its

employees and on-air talent, such as Bubba Clem.  Beasley ultimately suspended Bubba Clem's

live broadcast on WBRN-FM for a total of 8 days.  On October 6, 2015, the BTLS show returned

to the air on all of the Beasley stations that aired his program at that time.  On October 6, 2015,

at Beasley's request, Bubba Clem held a press conference in which he admitted having had

contact with a Nielsen PPM panelist and trying to influence that panelist's listening activities.

Nielsen's investigation revealed that Bubba Clem had been in contact with additional

Nielsen survey participants.  In or about August, 2015, Nielsen's internal procedures uncovered

suspect listening data received from another of its Tampa PPM panelists, Chuck Pellem

("Pellem").  Pellem's listening data showed that he had listened to WBRN 98.7 FM, the station

on which Bubba Clem's show is broadcast, for a total of approximately 1-1/4 hours cumulatively

during the first three months he served as a PPM panelist, and the following month, he supposedly listened to WBRN for 184 hours, i.e. an increase of more than 15,000% in just one month.  The suspect listening data from Pellem's PPM was detected by Nielsen's automated processes and subsequently removed from Nielsen's survey.  Nielsen de-installed Pellem and informed him on or about Friday, September 4, 2015, that he would no longer be part of Nielsen's PPM survey panel.  Tabachuk provided Nielsen with a screen shot of a September 5, 2015 text message from Bubba Clem in which Bubba Clem said, in an apparent reference to Pellem, "I had a guy who had just 1 of them" "And they took it from him Friday."  The timing of this message matched up with Nielsen's records, which showed that Pellem had been told that he been de-installed on Friday, September 4.  Pellem subsequently admitted to Nielsen that he worked nights and was usually asleep when Bubba Clem's show was on the air, which would have made it impossible for him to have listened to WBRN at the times indicated by the data received from his PPM.  Pellem admitted to communicating with Bubba Clem while Pellem was Nielsen PPM panelist.  Bubba Clem admits communicating with Pellem while Pellem served as a Nielsen PPM panelist and providing Pellem with devices that would have enabled Pellem to supply false and misleading listening data to Nielsen.  Pellem's listening data showed that Pellem was listening to the BTLS show while Pellem was likely to have been asleep.

Bubba Clem also communicated with a Nielsen survey participant while that individual served as a diary keeper in the Charleston, South Carolina market.  On or about May 15, 2015, Robert Mesler contacted Bubba Clem via social media and told Bubba Clem that his household would be participating in the Nielsen survey.  Mesler's household had received an offering in the mail from Nielsen asking the family to participate in the Nielsen survey.  Each of the five family members would receive their own personal diary in which they were to keep a record of their

radio listening for one week.  Bubba Clem communicated with Mesler, requesting that Mesler "Hook [Bubba] up big," "[a]ll mornings 6a-10. Entire morning."  Mesler agreed, and confirmed that he would follow Bubba's instructions with respect to filling out the diaries.  At the end of the survey period, Mesler returned the completed diaries to Nielsen containing the falsified listening information.

Throughout 2015, one of Nielsen's subscribers, Cox Media Group, Inc. ("Cox"), repeatedly complained to Nielsen about suspected ratings distortion by Bubba Clem.  This was of particular concern to Cox because its own morning drive time radio show hosted by Mike Calta was a direct competitor of the BTLS show in the Tampa Market, and Cox believed that it would likely be harmed if Bubba Clem was manipulating the ratings in his favor.  When Nielsen determined that Bubba Clem had in fact attempted to distort the Nielsen ratings in his favor and Clem admitted to contacting a Nielsen panelist, Cox blamed Nielsen for not taking sufficiently aggressive action against Bubba Clem, which harmed the relationship between Nielsen and Cox. As a direct result of Defendants' acts, Nielsen had to make significant price concessions to secure Cox's renewal agreements for 2017 and 2018, causing Nielsen to suffer financial harm. In addition, Nielsen has incurred significant out of pocket expenses consisting of lost license fees from Beasley, investigative and other out of pocket expenses, and expenses associated with locating, recruiting, empaneling, and training new PPM and diary panelists, as well as legal expenses to pursue its claims against Defendants.

**B.     Defendants' Statement of the Case**

Plaintiff Nielsen Audio, Inc. ("Nielsen") has a virtual monopoly over radio audience measurement and ratings opinions services nationally, including in the Tampa market. In the Tampa market, Nielsen primarily uses a device called a Portable People Meter ("PPM") to estimate radio audiences. A PPM is a portable device that looks like a beeper and is intended to be worn and carried by individuals known as panelists.  The PPM is designed to capture inaudible codes transmitted from radio broadcasts.  However, the accuracy of Nielsen's PPM measurement is so suspect that Nielsen places a legal  disclaimer on its ratings opinions that states "PPM ratings are based on audience estimates and are the opinion of Nielsen and should not be relied on for precise accuracy or precise representativeness of a demographic or radio market."

Defendant Bubba Clem ("Clem") hosts a radio show known as the Bubba the Love Sponge® Show, and he has over 30 years radio broadcast experience. During approximately the past 20 years, Clem has broadcasted his show from Tampa, Florida. During that time, Clem has enjoyed tremendous ratings success and his radio show was consistently rated as the number 1 morning drive radio show in Tampa, including for many years when Clem broadcasted his show on a Cox Media Group, Inc. ("Cox") owned Tampa radio station, WHPT-FM 102.5.

In 2014, Cox elected not to renew its contract with Defendants notwithstanding that Clem's show was the number 1 Nielsen rated show in Persons and Men 25 to 54, the key demographics targeted by WHPT, which was also the highest billing radio station in the Tampa market.  Subsequently, Defendants contracted with Beasley Media Group ("Beasley") to air the Bubba the Love Sponge® Show on WBRN beginning in January 2015. Within a few months Clem began to achieve his customary ratings success and as a result Beasley's advertising revenue began to increase significantly. During this same period, Cox's advertising revenue

began to decrease significantly.  Not surprisingly, Cox's management team in the Tampa market were extremely disappointed that WHPT could not maintain the ratings success it had when Clem was host of its morning drive show. This lead to great animosity between Clem's replacement at 102.5, Mike Calta ("Calta"), who used to be Clem's intern.  This animosity was also shared by Clem's and Calta's loyal fans.

Out of jealousy, Calta falsely accused Clem of ratings tampering on April 22, 2015. Calta did this in a live on-air conversation with Clem, violating Nielsen's rules.  Nielsen's subsequent investigation of these accusations resulted in no findings in support of said accusations.  In his over 30 years as a radio broadcaster, Clem had never been found to have engaged in ratings tampering, or even accused of such conduct.

Cox, Calta's employer and one of Nielsen's biggest clients, was not satisfied with the results of Nielsen's investigation.  Consequently, Cox continued to pressure Nielsen to investigate Clem and panelists that demonstrated heavy listening to Clem's broadcast.  Cox wanted to remove Clem as competition and exerted considerable pressure on Nielsen to intensely scrutinize Clem and even wanted Nielsen to conduct a sting operation.  Succumbing to the pressure from its valued client Cox, Nielsen began to scrutinize panelists that expressed a preference for listening to Clem and BRN's programming. This scrutiny lead to Nielsen's removal of three households of panelists which caused Clem's ratings to drop precipitously.  One of those households was removed simply because Nielsen opined that they could not guaranty that the household would not disclose that their participation as panelists due to their attendance at WBRN events.  Conversely, during the same period, a household of panelists with a similar fact pattern that attended Cox/Calta station events was not removed as panelists. Nielsen actions seem to clearly indicate its preference for Cox/Calta over Beasley/Clem.  This inconsistent

application of policy significantly prejudiced the Defendants and has caused irreparable financial damage.

An additional result of Calta's baseless on-air accusations was that panelists that were approved by Nielsen contacted Clem and Calta to show their support.  Nielsen again appeared to scrutinize panelist that showed support for Clem while not applying the same level of scrutiny to panelists that expressed support for Calta.  It is this contact by these Nielsen panelists and their subsequent communications with Clem that is the subject of Nielsen's lawsuit.

One of Clem's ardent fans, Nicholas Tabachuk, was the subject of vicious social media attacks in early 2015 by Calta's fans just for expressing his happiness on social media that Clem was again broadcasting after his departure from Cox's WHPT.  Tabachuk contacted Mr. Clem and asked for help.  Clem tried to help protect Tabachuk and provide support.  Little did Clem know that Tabachuk was a drug addict and a criminal who would do or say anything when the opportunity arose.  Mysteriously, Nielsen selected this criminal Tabachuk as a panelist even while Tabachuk was clearly in the middle of the social media war between Clem and Calta. Tabachuk communicated to Clem that he became a panelist. Two weeks after becoming a panelist, Tabachuk, who was a known Calta social media enemy, contacted Calta to advise that Clem had engaged in panelist tampering with Tabachuk.

Clem ultimately confessed to his improper actions with Tabachuk and issued a public apology.  During this time, Cox was exerting tremendous pressure on Nielsen to sanction Clem in an extremely prejudicial fashion, including ultimately demanding a "death penalty sanction" wherein Nielsen would refuse to ever provide ratings for Clem broadcasts.  Nielsen took unprecedented remedial actions against Clem's syndication affiliate, Beasley, as a result of Clem's alleged contact with Tabachuk and other panelists.  In fact, Nielsen delisted WBRN for

15

the months of September and October 2015, which is its most severe sanction and had never been levied against any PPM market radio station in history. Nielsen levied this draconian sanction notwithstanding its own admission that any alleged ratings tampering by Clem did not affect the ratings.

During the same period that Nielsen was taking these unprecedented measures against Defendants and Beasley, Nielsen was concealing incidents of internal fraud affecting the accuracy of its ratings opinions reported to its subscribers.  These incidents included a Nielsen employee fraudulently recruiting 18 households as panelists in the Tampa market. That incident affected the ratings in the Tampa market, however, Nielsen elected not to disclose that fact to its subscribers.  In contrast, Nielsen admits that Clem's alleged actions did not affect the ratings, but notwithstanding, Nielsen elected to delist WBRN and to initiate this lawsuit.

 Clem had never before or after the brief period alleged in the Amended Complaint engaged in any ratings tampering.  Clem apologized and received significant financial penalties from Beasley.  However, Beasley believed that Clem was contrite and elected to give Clem a second chance, much to the displeasure of Nielsen and Cox. Nielsen, using its monopolistic power, sought to have Beasley terminate its relationship with Clem and BRN.  This continued pressure resulted in Beasley terminating its relationship with Clem and BRN in the Tampa market in December 2016.  Nielsen's impermissible actions have resulted in severe damages to Clem and BRN.

In its Amended Complaint, Nielsen alleges that Defendants actions have damaged Nielsen notwithstanding the fact that Nielsen admits that the ratings were not affected by Defendants' alleged conduct.  Additionally, Nielsen states that the integrity of its ratings system is of paramount import to Nielsen and the radio industry.  However, this statement is

contradicted by the fact that Nielsen's ratings are flawed as evidenced by the fact that Nielsen's

"ratings" are self-described only as opinions that cannot be relied upon for precise accuracy.

Moreover, Nielsen neglects to expose its own internal errors that clearly affect the integrity of its

ratings opinions.  This case is not about damages inflicted on Nielsen's reputation by Clem, it is

about Nielsen wanting to make an example out of Clem because Beasley refused to terminate its

relationship with Clem and BRN.

## IV.   LIST OF ALL EXHIBITS WITH ANY OBJECTIONS THERETO

1.      The parties will offer as exhibits at trial one or more of the pre-marked exhibits

set forth on their respective exhibit lists.  These lists include the exhibit number to be used at

trial, a description of the exhibit, and identification by production number, deposition exhibit

number, or otherwise.  These lists include the parties' demonstrative exhibits.

2.      Nielsen's Exhibit List with the Defendants' objections ("Nielsen's Exhibit List")

is attached as Exhibit A-1.  Defendants' Exhibit List with Nielsen's objections ("Defendants'

Exhibit List") is attached as Exhibit A-2.  These lists do not include the parties' demonstrative

exhibits.

3.      Any exhibit identified in a party's Exhibit List and not objected to is deemed

admissible and authentic and may be entered into evidence, except that objections of FRE 104,

105, 106, 402, and 403 are reserved for trial.

4.      Each party reserves the right to introduce any exhibit listed in Exhibits A-1

through A-2, whether or not that particular party is the initial proponent of the exhibit.  Both

parties reserve the right to supplement their Exhibit Lists as permitted by the Court.

5.      Nothing herein shall be construed as a stipulation as to the relevance of any exhibit.

6.      Counsel will not be directed to "tender" any exhibit to opposing counsel for review in front of the jury.

7.      All video recordings and non-PowerPoint animations shall be provided on CD or DVD.  Copies of such exhibits shall be produced to the other party in color, 8 1/2 by 11 inch format.  The parties agree that exchange of large boards is not required and that these demonstrative exhibits may be exchanged on 8-1/2 by 11 inch paper.  All such exhibits and demonstratives shall be provided to opposing counsel not later than the close of business on the last business day before the start of trial.

8.      Exchange of Demonstrative and Non-Demonstrative Exhibits:

(i)  All demonstrative exhibits, other than those to be used for the first time on cross-examination of an adverse witness, shall be disclosed to the opposing party by 7:30 pm of the night before they are to be used for the first time by that party.  Objections to such demonstrative exhibits shall be provided to the opposing party by 9:30 pm the same night.  The parties shall meet and confer regarding the objections at 10:00 pm the same night.

(ii) Demonstrative exhibits to be used during cross-examination do not have to be disclosed or exchanged prior to use.

(iii) Demonstrative exhibits to be used during opening statements shall be exchanged one calendar day prior to the start of trial at 5:00 p.m. on that day.  Objections to these demonstrative exhibits shall be due by 9:00 p.m. on the same day.  The parties shall meet and confer regarding the objections at 9:30 pm on the same day.

(iv) If a party does not use one of its demonstrative exhibits at trial, the other party is precluded from using or referring to that specific exhibit at trial.  Nothing herein shall prevent the other party from using its own demonstrative on the same subject matter.

(v) The parties agree that exchange of large boards is not required and that these demonstrative exhibits may be exchanged on 8-1/2 by 11 inch paper.

(vi) This order does not preclude demonstrative exhibits created during trial testimony, which do not have to be exchanged.

(vii) Demonstrative exhibits to be used during cross-examination do not have to be exchanged prior to use.

9.      A party may read at trial (subject to such rulings as the Court may make as to admissibility) a factual statement made by or on behalf of its party-opponent in any of such party opponent's pleadings, initial disclosures, responses to interrogatories, responses to requests for admissions, or any amendment to or supplementation thereof, without any need for the offering party to have included the document being read from on its trial exhibit list, provided that the party seeking to read such statement provides notice by e-mail to the other party by 6:00 p.m. two (2) calendar days preceding the day on which such statement is intended to be presented at trial.  This notice requirement shall not apply in the event this evidence is introduced for impeachment purposes only.

## V.      LIST OF NON-EXPERT WITNESSES WHO MAY BE CALLED FOR TRIAL

1.      The list of witnesses that Nielsen may call for trial is attached as Exhibit B-1.

2.      The list of witnesses that Defendants may call for trial is attached as Exhibit B-2.

3.      Neither party shall be obligated to make a witness under its control such as employees or officers, available in the Middle District of Florida as a live witness at trial.  A

party wishing to call a witness at trial bears the burden of securing that witness's presence at trial, either voluntarily or by subpoena.  Alternatively, the testimony of any witness may be introduced using deposition designations in accordance with the procedures set forth herein.

4.      In addition to the witnesses to be identified as noted above, each party reserves the right to call the following individuals to testify in person or by deposition:

(a)  Such current or former employees of the parties or third parties to the extent required to authenticate or otherwise necessary to admit any disputed document into evidence; and

(b)  Any witnesses appearing on the other party's witness list, if not called as a witness by that party but there shall be no obligation to make such witness available in the jurisdiction solely for the purpose of being called as a witness by the other party.

5.      On or before the close of business on the last business day before the start of the trial, the parties will exchange trial witness lists, listing each witness the parties expect to actually call to testify, including any witness testifying via deposition.  On or before that same time, the attorney for each party must file with the Court their trial witness list, listing the full names of the witnesses who will be called, any professional designation applicable to each witness, and, if necessary, the phonetic spelling of the name.  On the morning of trial, counsel shall provide the Court with three copies of their witness list.

## VI.     LIST OF ALL EXPERT WITNESSES

1.      Nielsen's list of expert witnesses is attached as Exhibit C-1.

2.      Defendants' list of expert witnesses is attached as Exhibit C-2.

## VII.   STATEMENT OF ELEMENTS OF EACH CLAIM FOR WHICH MONEY DAMAGES ARE SOUGHT AND THE AMOUNT BEING SOUGHT FOR EACH CLAIM

1.      Nielsen's statement of elements of each claim for which money damages are sought and the amount being sought for each claim is attached as Exhibit D-1.

2.      Defendants' statement of elements of each claim for which money damages are sought and the amount being sought for each claim is attached as Exhibit D-2.

## VIII.   DEPOSITION TESTIMONY WHICH MAY BE OFFERED INTO EVIDENCE

1.      Nielsen's deposition designations, counter-designations, and rebuttal designations are attached as Exhibit E-1.

2.      Defendants' deposition designations, counter-designations, and rebuttal designations are attached as Exhibit E-2.

3.      To the extent a party does not designate witness deposition testimony because the party believes in good faith that the witness will appear at trial, and that witness subsequently does not appear at trial, the parties agree to permit testimony of that witness through deposition designations.  Affirmative deposition designations for the testimony of such witnesses, if not provided previously, shall be provided no later than three (3) days prior to the introduction of such testimony at trial.  Counter-designations, if any, shall be provided no less than 24 hours prior to the introduction of that deposition testimony at trial.

4.      With respect to witnesses called at trial by deposition, the party seeking to introduce deposition testimony shall identify the portions of the deposition that it intends to read or play into the record by 9:00 p.m. two (2) days before the party seeks to present the deposition testimony in Court.  The other party shall disclose any objections and counter designations to such deposition testimony by 1:00 p.m. the following day (the day before the deposition

testimony is presented in Court).  Any rebuttal designations, which can only be made for

completeness under Fed. R. Evid. 106, to the counter-designations must be provided by 7:00

p.m. the same day.  The parties will meet and confer on any objections by 9:00 p.m. that same

day, and will present any unresolved issues to the Court the morning of the proposed use of the

testimony.  These timing requirements are not applicable to the extent a witness is presented

solely to authenticate documents or otherwise provide testimony to admit any disputed document

into evidence.

     5.     With regard to the use of such deposition designations at trial, each party will

choose whether to play video of the testimony or read the testimony as their affirmative

designations, counter-designations, or rebuttal designations.  Regardless of the manner in which

such testimony is introduced, all designated testimony (original, counter, and rebuttal) will be

played or read to the jury as one consecutive segment, that is, in the order of the transcript.  The

party who initially proposed the use of the deposition testimony will provide the Court with an

accounting of the time for each party's designations so that the Court may accurately charge time

to the designating parties. Unless specific notice of the intent to introduce testimony by reading it

to the jury is provided within three (3) days prior to its use, it shall be assumed that the

designation will be played to the jury by video.  Should either party choose to introduce

deposition testimony by read-in as opposed to video, the other party may introduce counter-

designations by video.  If either party elects to introduce deposition testimony by video, then all

counter-designations and rebuttal designations must also be by video.  To the extent technical

difficulties are encountered by a party during the presentation of video deposition testimony at

trial, the deposition testimony offered by that party may be read-in.

## IX.     CONCISE STATEMENT OF UNDISPUTED FACTS

1.     The parties do not dispute any of the facts stated in Exhibit F.  These undisputed facts require no proof at trial, will become part of the evidentiary record in this case, and may be read to the jury by the Court or any party.

## X.      CONCISE STATEMENT OF AGREED ISSUES OF LAW

1.     The statement of applicable principles of law on which there is agreement is attached as Exhibit G.

## XI.     CONCISE STATEMENT OF ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

1.     Nielsen's statement of issues of fact which remain to be litigated is attached as Exhibit H-1.

2.     Defendants' statement of issues of fact which remain to be litigated is attached as Exhibit H-2.

## XII.    CONCISE STATEMENT OF ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT

1.     Nielsen's statement of issues of law which remain for determination by the Court is attached as Exhibit I-1.

2.     Defendants' statement of issues of law which remain for determination by the Court is attached as Exhibit I-2.

## XIII.   CONCISE STATEMENT OF ANY DISAGREEMENT AS TO THE APPLICATION OF THE RULES OF EVIDENCE OR CIVIL PROCEDURE

None at this time.

## XIV.    LIST OF ALL MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT

There are no motions currently pending before the Court.  The parties anticipate filing Motions in Limine at the appropriate time prior to trial.

## XV.  OTHER MATTERS

**1.      Length of Trial.**  Trial of this case is expected to take seven (7) days with an equal number of hours per side for trial.

**2.      Type of trial.**

Jury     [X]                          Non-Jury   [_]


**3.      Number of jurors.**  The parties recommend that 8 jurors be selected at the commencement of the trial.

**4.      Technology in the courtroom.** Nielsen will file a motion seeking authorization to use electronic equipment in the courtroom, and to have wireless internet access, in advance of trial in accordance with this Court's practice.

**5.      Voir Dire, Jury Instructions, and Verdict Form**.  The parties will submit proposed voir dire, preliminary and final jury instructions, and verdict forms on February 28, 2018.  Any disputes remaining at that time will be noted for the Court for resolution prior to or at the commencement of the trial.

**6.      Reservation of Rights**.  The parties reserve the right to modify their proposed pretrial submissions, jury instructions, and verdict forms as necessary based on, among other things, any rulings of the Court or new evidence.  The parties have taken positions regarding issues that should be included or excluded at trial and whether such issues are for the jury or the Court.  To the extent the Court rules an issue should be included in or excluded from the case, nothing herein prevents a party from modifying their proposed pretrial submissions, jury instructions, and verdict forms as necessary to reflect the Court's ruling.

7.      **Exclusion of Witnesses**.  The parties request pursuant to Fed. R. Evid. 615 that the Court prevent fact witnesses from hearing the testimony of other witnesses prior to giving their own testimony.  The parties further request that in accordance with provision two (2) of Rule 615, this exclusion will not apply to a party's corporate representative.  Plaintiff shall be entitled to have two corporate representatives present at all times at trial.  Each corporate defendant shall be entitled to have one corporate representative present at all times at the trial.  The parties further request that expert witnesses not be excluded for either fact or expert testimony.

*       *       *

This Order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

Jointly submitted:


/s/*Lawrence C. Drucker*      | /s/*Richard Rodriguez*

/s/*Lawrence C. Drucker*

Alfred R. Fabricant (*pro hac vice*)
Lawrence C. Drucker (*pro hac vice*)
Sarah G. Hartman (*pro hac vice*)
Jessica Lu (*pro hac vice*)
BROWN RUDNICK LLP
7 Times Square
New York, New York 10036
(212) 209-4900
Email: afabricant@brownrudnick.com
       ldrucker@brownrudnick.com
       shartman@brownrudnick.com
       jlu@brownrudnick.com


Mark J. Ragusa
Florida Bar No.:  0829633

/s/*Richard Rodriguez*

Todd Foster
Florida Bar No. 325198
Richard Rodriguez
Florida Bar No. 083546
Jonah Dickstein
Florida Bar No. 27686
TODD FOSTER LAW GROUP
1881 W. Kennedy Blvd.
Tampa, Florida 33606
Telephone: (813) 229-7373
Facsimile: (813) 280-9981
Email: tfoster@tfosterlaw.com
       rrodriguez@tfosterlaw.com
       jdickstein@tfosterlaw.com
*Counsel for Defendants Bubba Clem a/k/a*
*Bubba the Love Sponge and Bubba Radio*

GUNSTER, YOAKLEY & STEWART, P.A.      *Network, Inc.*
401 E. Jackson Street, Suite 2500
Tampa, Florida 33602
(813) 222-6619; Fax:  (813) 228-6739
E-mail: mragusa@gunster.com

*Counsel for Plaintiff*
*Nielsen Audio, Inc.*

IT IS SO ORDERED this _____ day of _____, 2018

_____
The Honorable James D. Whittemore
United States District Judge

26